USCA1 Opinion

 

 United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 96-2050 VINCENT DeNOVELLIS, Plaintiff, Appellant, v. DONNA E. SHALALA, SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Patti B. Saris, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Jodie Grossman, with whom ALEF, Inc., was on brief for appellant. ______________ __________ George B. Henderson, II, Assistant United States Attorney, with _______________________ whom Donald K. Stern, United States Attorney, was on brief for _______________ appellee. ____________________ September 2, 1997 ____________________ BOWNES, Senior Circuit Judge. Plaintiff Vincent BOWNES, Senior Circuit Judge. _____________________ DeNovellis brought this action alleging employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., and under the Age ________ Discrimination in Employment Act (ADEA), 29 U.S.C. 621 et __ seq., against his employer, the Secretary of the United ____ States Department of Health and Human Services (HHS). He alleged that he was discriminated against on the basis of his race, national origin, and age, in his work assignments, in denials of promotions and awards, and in being subjected to a hostile work environment. The district court granted summary judgment to the defendant. We affirm. I. A. Facts _____ Viewed in the light most favorable to the nonmoving party (DeNovellis) and drawing all reasonable inferences in his favor, the following facts are treated as undisputed for purposes of the motion for summary judgment. DeNovellis is a white male of Italian descent. He was sixty-six years old at the time he filed this action in 1994.  From 1979 to 1991 DeNovellis served as Deputy Regional Administrator (DRA) of the Boston Regional Office of Human Development Services (HDS), which was part of HHS. DeNovellis's position was eliminated in an agency reorganization that occurred in the spring of 1991. After -2- 2 some months "in limbo," in the form of temporary assignments to "meaningless" positions, DeNovellis became the program manager of the Aid to Families with Dependent Children (AFDC) program within the recently formed Administration for Children and Families (ACF). His civil service grade remained the same: GS-14.  Until the reorganization, DeNovellis's supervisor, A. Kenton Williams, was the Regional Administrator (RA) of HDS. Williams was a black male of the age of fifty-five when this action was filed. There were racial tensions in the office. Williams often spoke out against the "insidious racism that exists in our society," and, according to DeNovellis, "would try to justify the behavior and reactions of black staff persons, who having been subjected to racial discrimination over the years, reacted differently under certain circumstances." Williams also wrote a letter to the editor of the Boston Globe commenting on the "tremendous ____________ pressures" faced by black executives. These comments about the inequities suffered by blacks made DeNovellis feel uncomfortable.  There were also ethnic and race-related comments around the office that Williams condoned. Members of the staff would say things like "Vinnie, why don't you have your people (Mafia) in the North End take care of them." (The North End is a largely Italian neighborhood of Boston.) Both -3- 3 Williams and a black friend of his, St. Clair Phillips, made negative comments about DeNovellis's ethnicity. And staff members made general references to "you whites" in Williams's presence. Williams and DeNovellis also had work-related conflicts. Part of DeNovellis's job as DRA was to take charge of the regional activities during the RA's absence. Williams was often absent from the office and became concerned that DeNovellis was signing so much correspondence on Williams's behalf that it would highlight the frequency of his absences. For this reason, Williams ordered DeNovellis in 1989 to stop signing letters on his behalf. In 1989 and 1990, other government administrators, including Williams's supervisor in Washington, Pamela Coughlin, who was white, told Williams that DeNovellis was spreading negative comments about Williams. On more than one occasion, Williams also had to intervene in heated disputes that DeNovellis had with other people in the office. One such incident pertained to the distribution of space, and another concerned whether a minority student (who did not report to DeNovellis) had been absent from work. In 1990, certain federal employees were given the opportunity to choose early retirement. DeNovellis was eligible to retire but rejected the offer. Several people, -4- 4 including Williams and two of his black friends, urged DeNovellis to take this opportunity and retire. The heart of DeNovellis's complaint is an assignment to a temporary "detail" to an "unestablished position" in the Office of Fiscal Operations (OFO) in October 1990. Williams claims he was instructed to order this reassignment by Coughlin, his (white) supervisor. Nevertheless, Williams now admits that the detail was "a sham," and was concocted in part because Williams did not want DeNovellis to be his deputy. On October 9, 1990, Williams removed DeNovellis from the order of succession to act as RA. DeNovellis suffered no diminution in grade, pay, or benefits during the detail. He worked under the supervision of Williams's friend, St. Clair Phillips, who was black. Officially, DeNovellis was responsible for financial activities, for which he had no training or capability. For the first month and a half, he "performed the same (DRA) duties under a new supervisor." In mid-November, the new supervisor, Phillips, asked Williams to end the detail because DeNovellis did not have the background to perform the OFO work and he was refusing to perform his old DRA duties. Williams refused. The detail was due to expire in February 1991 but, upon Williams's request, was extended through March 31, 1991.  -5- 5 On March 8, 1991, DeNovellis filed an EEO complaint, alleging age, race, and national origin discrimination in assignment of duties, awards, and reassignment. On April 11, three days after the EEO officer interviewed Williams, Williams filed forms requesting that DeNovellis's position be switched with that of Paul Kelley, a black male who was a friend of Williams's and who was a supervisory accountant in OFO. According to DeNovellis, Williams's purpose in making this request was to protect the grades of Phillips and Kelley, both black and both friends of his, in an impending classification review. However, the classification review and the proposed "job swap" were never carried out, overtaken by the agency's restructuring in the spring of 1991. Around the same time that DeNovellis's initial detail expired at the end of March 1991, HHS underwent an internal restructuring. The former HDS and another sub- agency of HHS, the Family Support Administration, were merged into a new entity, the Administration for Children and Families (ACF). The restructuring took several months to effectuate. During the transition, DeNovellis maintained his title of DRA of HDS and carried out some tasks of the Deputy position, but he received no official assignments; as before, people came to him for information.  -6- 6 In April or May 1991, Hugh Galligan, a white male, was appointed Acting Regional Administrator of the new ACF; he appointed Williams as his Deputy. By May, Williams was no longer in charge of the Boston office. The appointments of Galligan and Williams were finalized on August 23, 1991. Two days later, DeNovellis's position was "realigned"; his official title remained DRA of HDS (even though HDS was phasing out) but this was now within the new ACF. The result was that Williams was DRA of ACF, and DeNovellis retained the job title "DRA" but remained unassigned in the new agency. His grade remained unchanged throughout this period. In December 1991 Williams left Boston for a position in Washington, D.C. Galligan then transferred Phillips, who had been the head of OFO of the new agency, to the DRA position at the new agency. Because Phillips was a GS-15 and the new DRA opening was a GS-15, Galligan could transfer Phillips laterally into the position without a competitive search. Since DeNovellis was a GS-14, he could not have been promoted to Williams's former position unless a job vacancy announcement had been made and a competitive search performed. There is no evidence that Galligan was precluded from instituting such a search and considering DeNovellis for the position. In May 1992 DeNovellis was reassigned from DRA of the Office of Family Security (OFS) in the new agency, to a -7- 7 supervisory position as program manager in the same OFS. This was not part of the management team of the new agency. DeNovellis was the last person appointed to a permanent position in the new agency. Galligan has since detailed him twice to the OFO as an assistant goal leader for ongoing restructuring. (Thus, in some respects, DeNovellis claims his job assignments have been inappropriate because they were beneath his DRA status and in other respects inappropriate because the positions required accounting or financial qualifications which he did not possess.) According to DeNovellis, at least part of the reason for the delay in his reassignment in the new agency was a "position paper" he wrote in early 1992. The paper pointed out the "convoluted interactions that were going on," and it accidently was mailed to a lot of people in the region, creating a furor. Galligan was asked to find out who was responsible for this position paper. During the investigation, DeNovellis's computer was confiscated. B.  District Court Proceedings __________________________ The district court granted summary judgment to the Secretary as to all claims. It dealt separately with each of the four types of adverse action alleged by DeNovellis. The court relied on Landgraf v. USI Film Prods., 511 U.S. 244 ________ ________________ (1994), to reject the Title VII claim for deprivation of -8- 8 duties that occurred prior to November 21, 1991, the effective date of the Civil Rights Act of 1991, 42 U.S.C.  1981a ("the Act" or "the 1991 Act"). The court concluded, essentially, that even if DeNovellis was discriminated against, he was not entitled to any remedy for it. The equitable remedies available under Title VII prior to the 1991 Act were not appropriate because he suffered no loss in pay or loss of job that would warrant back pay or reinstatement (he did not seek reinstatement). And the new remedies made available under the 1991 Act (in particular, compensatory damages) are only available for acts which took place after November 21, 1991, and therefore did not apply to DeNovellis's claims of pre-Act discrimination.1 The district court rejected DeNovellis's claim of post-Act deprivation of duties based on his failure to present sufficient evidence to enable a reasonable trier of fact to conclude that the employer's motive for such deprivation was discriminatory. Whereas DeNovellis provided indirect evidence that Williams might have been motivated by improper reasons in making pre-Act assignments, Williams was no longer in charge of the Boston office after May 1991 and he left Boston altogether in December 1991. The court held that DeNovellis could not bootstrap the pre-May 1991 alleged  ____________________ 1. The court also concluded that such remedies were not available under the ADEA as a matter of law, and DeNovellis has not appealed that ruling. -9- 9 discrimination by Williams into sufficient evidence for a reasonable trier of fact to conclude that post-November 1991 decisions were animated by similar illegal bias.  DeNovellis also made a claim of hostile work environment based on negative comments about his ethnic background coupled with his "sham detail." The district court rejected this claim for essentially the same reasons it rejected the deprivation of duties claims: any pre-Act violation was a wrong without a remedy based on Landgraf, and ________ there was insufficient evidence that any post-Act discrimination had occurred. The court stated in one sentence an alternative ground for its ruling: failure to exhaust administrative remedies.2 The district court also granted summary judgment to the Secretary on DeNovellis's claim that his computer was confiscated in retaliation for filing an EEO complaint. The court rejected this claim under Title VII on the ground that DeNovellis failed to exhaust his administrative remedies, because his EEO complaint alleged nothing about retaliation. The court rejected the retaliation claim under ADEA on the merits (the government had waived exhaustion as to ADEA). The court concluded that DeNovellis failed to present any  ____________________ 2. DeNovellis also presented to the district court a claim that he was denied the opportunity to be considered for promotion to the DRA position in the new agency (ACF) after Williams vacated it in December 1991. He does not pursue this claim on appeal.  -10- 10 evidence to establish a causal connection between his March 1991 age discrimination complaint against Williams and the February 1992 confiscation of his computer by Galligan. DeNovellis does not appeal this conclusion. DeNovellis pursues three arguments on appeal: (1) that he is entitled to the remedies delineated in the Civil Rights Act of 1991 because his pre-Act and post-Act deprivation of duties were part of one continuing violation and the effects of his "employment purgatory" extended beyond the effective date of the Act; (2) that the district court erred in requiring him to exhaust his administrative remedies as to post-detail deprivations of duties and hostile work environment; (3) that the district court was obliged to provide him with a declaratory judgment and/or an award of attorney's fees. II. Standard of Review __________________ We review grants of summary judgment de novo. Dubois v. United States Dep't of Agriculture, 102 F.3d 1273, ______ __________________________________ 1283 (1st Cir. 1996), cert. denied, 117 S. Ct. 2510 (1997). ____________ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the -11- 11 moving party is entitled to a judgment as a matter of law."3 Fed. R. Civ. P. 56(c). "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56(e) advisory committee's note to 1963 Amendment. The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the _____________ _______ moving party has properly supported her motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor. Id. at 322-25. At this stage, the nonmoving party ___ "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he would bear the ultimate burden of proof  ____________________ 3. A factual dispute is material if it has the potential to affect the outcome of the litigation under the applicable law; it is genuine if there is evidence sufficient to support rational resolution of the point in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, ___ ________ ___________________ 248 (1986). -12- 12 at trial. Anderson, 477 U.S. at 256; see Celotex, 477 U.S. ________ ___ _______ at 321-23. Like the district court, in deciding a summary judgment motion we are obliged to view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. Dubois, 102 F.3d at 1284. ______ The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 ________ (citation omitted).  Summary judgment is not "automatically preclude[d]" even in cases where elusive concepts such as motive or intent are at issue. Valles Velazquez v. Chardon, 736 F.2d 831, 833 ________________ _______ (1st Cir. 1984). "[I]f the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," summary judgment may be appropriate even where intent is an issue. Smith v. Stratus Computer, _____ _________________ Inc., 40 F.3d 11, 12 (1st Cir. 1994) (internal quotation ____ marks omitted). Where, however, the nonmoving party has produced more than that, trial courts should "use restraint in granting summary judgment" where discriminatory animus is in issue. Valles Velazquez, 736 F.2d at 833; see _________________ ___ Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d ____________ _________________________________ -13- 13 922, 928 (1st Cir. 1983) (courts are "particularly cautious" about granting summary judgment in such cases). III. Landgraf and the Continuing Violation Issue ___________________________________________ The district court granted summary judgment to the government as to pre-Act deprivation of duties. The court correctly found that the five-month assignment of DeNovellis to a financial position for which he had no background and the concomitant deprivation of meaningful duties constituted an adverse employment action within the meaning of Title VII. See Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996) ___ _________________ (holding that "tak[ing] something of consequence from the employee," including "divesting her of significant responsibilities," constitutes an adverse employment action); see also Collins v. Illinois, 830 F.2d 692, 704 (7th Cir. ________ _______ ________ 1987). The court also found that there was sufficient evidence in the record to create a factual dispute as to whether the sham detail and the deprivation of duties were motivated by illegal discrimination on Williams's part or by race-neutral (and therefore not violative of Title VII) personality conflict or cronyism. The court held that, although DeNovellis would have a triable issue as to liability for pre-Act discrimination, he had no right to a remedy under the law as it existed prior to the 1991 Act. -14- 14 Prior to enactment of the Civil Rights Act of 1991, plaintiffs in Title VII cases were limited to equitable remedies (including back pay, reinstatement, and injunctive relief). Landgraf v. USI Film Prods., 511 U.S. 244, 252 ________ ________________ (1994). The Act, which became effective on November 21, 1991, amended Title VII, and "effect[ed] a major expansion in the relief available to victims of employment discrimination." Landgraf, 511 U.S. at 254-55. The 1991 Act ________ created a right on the part of individuals alleging intentional unlawful discrimination to recover compensatory damages "for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," as well as punitive damages. 42 U.S.C. 1981a(a)(1) & (b)(3) (1994); see ___ Morrison v. Carleton Woolen Mills, Inc., 108 F.3d 429, 437 ________ ____________________________ (1st Cir. 1997). The Act also gave Title VII plaintiffs the right to a jury trial in cases where they seek compensatory or punitive damages. 42 U.S.C. 1981a(c). These new provisions, however, do not apply to conduct that occurred before the effective date of the Act, November 21, 1991. Landgraf, 511 U.S. at 247, 286. ________ Applying Landgraf to the instant case, the district ________ court concluded that, even if DeNovellis were to establish after trial that his sham detail and employment "purgatory" violated his rights under Title VII, he would not be entitled -15- 15 to any remedy. This is because the sham detail ended in March 1991, prior to the effective date of the 1991 Act. Therefore, even if liability were found after trial as to that detail, the only remedies that would have been available to DeNovellis were equitable, such as reinstatement, back pay, or an injunction. As the district court analyzed the remedies for pre-Act conduct: because DeNovellis "suffered no loss of pay, he may not recover back pay; because he did not quit his job, he does not seek reinstatement. There is no possibility of enjoining Williams from future details because he is no longer in the office, and DeNovellis does not seek an injunction against details by Galligan. In short, the five-month detail ending in the spring of 1991, if based upon illegal discrimination, was a wrong without a remedy." As to the post-Act deprivation of duties, the district court found insufficient evidence to create a triable issue as to discriminatory intent. DeNovellis does not directly appeal the latter determination. Instead, DeNovellis takes issue with both rulings, pre-Act and post-Act, by essentially conflating the two. DeNovellis argues that he was the victim of a continuing violation that began before November 21, 1991, and continued thereafter, entitling him to compensatory damages under the 1991 Act. A related continuing violation argument has been applied to other time requirements imposed by the -16- 16 antidiscrimination laws,4 but the theory on which DeNovellis bases his argument is not one that the courts have approved. We have delineated two types of continuing violation cases: systemic and serial. Pilgrim v. Trustees _______ ________ of Tufts College, 118 F.3d 864, ___, 1997 WL 370286, at *3 _________________ (1st Cir. 1997); see Barbara Lindemann & Paul Grossman, ___ Employment Discrimination Law 1351-63 (3d ed. 1996). A _______________________________ systemic violation usually "has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitation period, a challenger may be deemed to have filed a timely complaint," even if he fails to show "an identifiable discrete act of discrimination transpiring within the period." Jensen v. Frank, 912 F.2d ______ _____ 517, 523 (1st Cir. 1990). DeNovellis does not argue that there was a systemic violation here. Rather, he argues (A) that a serial violation occurred; (B) that the continuing effects of his pre-Act deprivation of duties constituted a continuing violation; and (C) that he was subjected to a continuing hostile work environment. We will address each of these arguments in turn.  ____________________ 4. The issue usually arises in the context of a statute of limitations challenge. See, e.g., United Airlines, Inc. v. _________ _________________________ Evans, 431 U.S. 553 (1977). But a continuing violation _____ theory could be applied to any time requirement imposed by Title VII, whether it be the effective date of an amending statute, as here, or a statute of limitations, as in Evans. _____ -17- 17 A. Serial Violation ________________ A serial violation "is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate wrong actionable under Title VII." Jensen, 912 F.2d at 522; Mack v. Great ______ ____ _____ Atl. & Pac. Tea Co., 871 F.2d 179, 183 (1st Cir. 1989). To ___________________ state a claim under this type of continuing violation, DeNovellis would have to show that at least one actionable violation occurred within the relevant time period, even though the series had begun prior to November 21, 1991. See ___ id.; Pilgrim, 118 F.3d at ___, 1997 WL 370286, at *3. He ___ _______ could then be awarded the remedies made available in the 1991 Act. Cf. Sabree v. United Bhd. of Carpenters & Joiners, 921 ___ ______ ___________________________________ F.2d 396, 401 (1st Cir. 1990) (In a continuing violation case, back pay remedy "may be based on acts that occurred prior to the limitations period when a violation has been established by an act within the period."). We must ask, therefore, whether DeNovellis's post-Act deprivation of duties constituted one or more separate violations of Title VII. To show an actionable violation, DeNovellis would have to satisfy the familiar three-step McDonnell Douglas ___________________ framework for analyzing discrimination claims. See McDonnell ___ _________ Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973); _______________ _____ Lattimore v. Polaroid Corp., 99 F.3d 456, 465 (1st Cir. _________ ______________ 1996). Of critical importance here, he would have to offer -18- 18 facts, at an evidentiary level sufficient to withstand a motion for summary judgment, showing that the alleged adverse employment action was motivated by discrimination on the basis of his race, national origin, or age (for an ADEA violation). See St. Mary's Honor Ctr. v. Hicks, 509 U.S. ___ ______________________ _____ 502, 511 (1993); Texas Dep't of Community Affairs v. Burdine, ________________________________ _______ 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff"). Of course, direct evidence of discriminatory intent is often hard to come by, and circumstantial evidence is often the only means of proving such intent. See United States Postal Serv. Bd. of Governors ___ ___________________________________________ v. Aikens, 460 U.S. 711, 716 (1983); Lindemann & Grossman, ______ supra, at 11. As the Court noted in Hicks, DeNovellis may _____ _____ show discriminatory motive by circumstantial means: "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit [but not require] the trier of fact to ______ infer the ultimate fact of intentional discrimination, and, . . . upon such rejection, no additional proof of discrimination is required." Hicks, 509 U.S. at 511 ________ _____ -19- 19 (footnote and internal quotation marks omitted); see also _________ Burdine, 450 U.S. at 256 (plaintiff may succeed either _______ directly or "indirectly by showing that the employer's proffered explanation is unworthy of credence.").  "[A]t the summary judgment stage the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 ________ U.S. at 249. The district court found that DeNovellis failed to offer sufficient evidence, direct or circumstantial, to meet his burden, even at the summary judgment stage of the litigation, of providing substantive evidence that discrimination was a factor in his post-Act deprivation of duties.  DeNovellis does not seriously contest that finding on appeal. Nor could he: the record in this case presents qualitatively different scenarios for the pre-Act and the post-Act periods. The district court correctly found that there was enough evidence of possible discriminatory animus between Williams and DeNovellis that a jury could find the pre-Act detail was motivated by discrimination and not mere personality differences or cronyism. But once that detail ended and Williams was no longer in charge of the Regional Office, the reasons for DeNovellis's assignments were neither analogous nor part of the same pattern or series. There is -20- 20 precious little evidence or inference to get to a trier of fact on discriminatory motive for post-Act employment decisions. Of course, discrimination is not precluded merely because Williams was no longer in charge. Nor does the fact that Galligan is white insulate the defendant from a charge that Galligan's actions were motivated by race. After all, for the first eight months of Galligan's tenure as RA, Williams was Galligan's deputy. Galligan, as the new person in the office, might very well have given great weight to Williams's allegedly biased recommendations about reassignment of subordinate personnel during the reorganization, transition, and realignments. But DeNovellis presented no evidence of such discriminatory taint, either directly or by inference.  Indeed, there is evidence to the contrary. Bureaucratic delays arising from the reorganization, which indisputably had nothing to do with DeNovellis or with invidious characteristics, overtook DeNovellis's personal situation. Further, at his deposition, DeNovellis denied that any of Galligan's actions were motivated by invidious discrimination in any decision affecting DeNovellis's employment. And DeNovellis himself attributed a significant part of the delay in assigning him to a permanent position in the new agency to his own error in judgment: the "position paper" that he wrote and widely disseminated. The district -21- 21 court correctly concluded that the record in this case contains virtually no evidence of post-Act violations. Therefore, DeNovellis cannot rely on a serial violation theory to defeat the Secretary's motion for summary judgment. B. Continuing Effects __________________ DeNovellis also argues another theory to circumvent Landgraf: that the pre-Act sham assignment constituted a ________ continuing violation through its continuing effects. Although the assignment itself was a discrete action that was over and done with before November 21, 1991, DeNovellis emphasizes that its effects continued into the post-Act _______ period. According to DeNovellis, these post-Act effects turn the pre-Act discrimination into a continuing violation that continued post-Act, thereby triggering the 1991 Act's remedies. But continuing effects, without additional post- Act discriminatory actions, do not turn a discrete pre-Act decision into a continuing violation. See United Air Lines, ___ _________________ Inc. v. Evans, 431 U.S. 553, 558 (1977). ____ _____ At one time, it was thought that this "continuing effects" theory described a viable third type of continuing violation case, in addition to systemic and serial violations. But the Court has made it clear that the focus of the inquiry in continuing violation cases should be on "whether any present violation exists," not whether there are residual effects of past discriminatory conduct to which the -22- 22 statute does not apply. Id. (holding that a discriminatory ___ act, not merely the effects of a past discriminatory act, _______ ____ must occur within the statute of limitations period of Title VII); see Delaware State College v. Ricks, 449 U.S. 250, 258 ___ ______________________ _____ (1980); Sabree, 921 F.2d at 400. "[A] court evaluating a ______ 'continuing violation' argument must distinguish between a continuing violation and the continuing effects of a prior, yet discrete and no longer existent, discriminatory act."5 Cajigas v. Banco de Ponce, 741 F.2d 464, 469 (1st Cir. 1984); _______ ______________ see Pilgrim, slip op. at 9; Kassaye v. Bryant College, 999 ___ _______ _______ _______________ F.2d 603, 606 (1st Cir. 1993).  We recently rejected a plaintiff's theory that the failure to restore her to her prior position formed part of a continuous chain of misconduct extending beyond the time deadline. Morrison, 108 F.3d at 443. We held that the ________ employer's "inaction [was] not enough." Id. We pointed to ___  ____________________ 5. We note that this is a rule governing what kind of conduct creates liability, not a rule of evidence. Past acts of discrimination may constitute relevant background evidence and therefore may be admissible at trial. See Evans, 431 ___ _____ U.S. at 558; Sabree, 921 F.2d at 400 n.9, 402.  ______ Moreover, although not considered in determining liability, the continuing effects of discriminatory conduct are considered at the relief stage if liability is found. "The objective of fashioning an appropriate remedy in Title VII cases is to formulate the most complete relief possible to eliminate the effects of discrimination." Sabree, 921 ______ F.2d at 401 (internal quotation marks omitted); see Albemarle ___ _________ Paper Co. v. Moody, 422 U.S. 405, 418-21 (1975) (To the __________ _____ extent consistent with statutory limitations, once a violation of Title VII has been found, it is important for courts to fashion "make whole" relief.).  -23- 23 what we had said in a somewhat analogous situation: "'it was incumbent upon [the plaintiff] to allege facts giving some indication that the later refusals were themselves separate . . . violations.'" Valles Velazquez, 736 F.2d at 833 _________________ (quoting Goldman v. Sears, Roebuck & Co., 607 F.2d 1014, 1018 _______ ____________________ (1st Cir. 1979)). The same reasoning applies to the instant case. Even though DeNovellis's sham detail had not been remedied by the time the Act became effective, the focus at the liability stage of our inquiry is the date the employer made the allegedly discriminatory decision to detail him, even though the decision's effects still persisted after that effective date. See De Leon Otero v. Rubero, 820 F.2d 18, 20 ___ _____________ ______ (1st Cir. 1987) (Defendants' refusal to reinstate plaintiff "was not a separate act of discrimination, but rather a consequence of his initial demotion."); Valles Velasquez, 736 ________________ F.2d at 833 (demotion followed by defendant's repeated refusals to reinstate plaintiff did not constitute a continuing violation); Goldman, 607 F.2d at 1018-19 (denial _______ of requests to be retransferred back to original department after allegedly discriminatory initial transfer did not constitute a continuing violation). We conclude that DeNovellis's continuing effects argument is legally insufficient. C. Hostile Work Environment ________________________ -24- 24 As his final salvo against the Landgraf bulwark, ________ DeNovellis argues a theory of hostile work environment which would constitute a continuing violation of Title VII.6 See ___ Mills v. Amoco Performance Prods., Inc., 872 F. Supp. 975, _________________________________________ 986 (S.D. Ga. 1994) (A "hostile environment sexual harassment claim is an archetypal continuing violation claim."). He cites cases involving sexual harassment where courts have concluded that the allegations "were not discrete and independent acts of sexual harassment . . . but additional components of one cause of action for an alleged sexually hostile environment." Mills, 872 F. Supp. at 985. "A _____ hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of  ____________________ 6. The government argues that DeNovellis cannot raise this hostile work environment argument here because he failed to allege it in his complaint. That view misconstrues the purpose of the complaint in federal litigation. Under the concept of notice pleading, a complaint need not clearly articulate the precise legal theories upon which the plaintiff bases his right to recovery. The complaint must simply "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 150 n.3 _____________________________________ (1984) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). _________________ The plaintiff in the present case made clear in his complaint the types of adverse action he was alleging (sham detail, derogatory comments), and set forth the discriminatory basis that he claimed for those actions (race, national origin, age), in violation of Title VII and the ADEA. As for legal theories, he then put his continuing hostile work environment theory before the district court when the court considered the defendant's motion for summary judgment (albeit in a reply brief). That is sufficient to enable the plaintiff to argue that theory on appeal. Cajigas v. Banco de Ponce, 741 _______ ______________ F.2d 464, 468 n.12 (1st Cir. 1984). -25- 25 action to be judged each on its own merits." Vance v. _____ Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1511 (11th Cir. _____________________________ 1989). The Mills court therefore allowed the plaintiff to _____ seek recovery of compensatory and punitive damages for any post-Act conduct amounting to sexual harassment under Title VII. Id.  ___ Although DeNovellis does not discuss them, other courts have allowed Title VII claims for harassment other than sexual harassment. See Lattimore, 99 F.3d at 463; ___ _________ Lindemann & Grossman, supra, at 749-54. Indeed, until recent _____ years, one of the most common forms of harassment claim was verbal abuse, such as racial epithets. See Lindemann & ___ Grossman, supra, at 749-54. Harassment may also consist of _____ pranks and other forms of hazing, even without racial slurs, although, in such cases, "courts look especially closely to see whether the conduct is in fact racially [or otherwise invidiously] motivated." Id. at 753.  ___ Not all offensive conduct is actionable as harassment; trivial offenses do not suffice. See Meritor ___ _______ Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986). The Court has _________ ______ ruled that, in order to establish a Title VII claim for sexual harassment under a hostile environment theory, the conduct must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive [or hostile] working environment.'" Harris v. ______ -26- 26 Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Los ____________________ ___ Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 _______________________________ _______ n. 13 (1978)); see Vinson, 477 U.S. at 67; Carleton Woolen ___ ______ _______________ Mills, 108 F.3d at 439. _____ In determining whether harassment on the job is sufficiently severe or pervasive to rise to the level of a Title VII violation, courts look to the gravity as well as the frequency of the offensive conduct. See, e.g., Vance, __________ _____ 863 F.2d at 1510-11 (noose hanging from light fixture above employee's work station twice was sufficient to establish harassment violation). Guidelines published by the Equal Employment Opportunity Commission (EEOC) require that sexual harassment be severe enough to alter the victim's workplace experience (even if the conduct only occurs once), or pervasive enough to become a defining condition of the workplace. EEOC Policy Guidance on Sexual Harassment, 8 FEP Man. at 405:6689; see Lindemann & Grossman, supra, at 794. ___ _____ Sexual harassment can be severe enough to be illegal even without tangible effects on job performance or psychological well-being. Harris, 510 U.S. at 22.  ______ DeNovellis's reliance on sexual harassment cases such as Mills is misplaced because the situations are not _____ analogous. Mills and other sexual harassment cases involve a _____ pervasive and continuing hostile work environment, which constitutes a continuing violation, akin to a systemic -27- 27 (continuing practice) violation. In contrast, DeNovellis's allegations of "purgatory" job assignments set forth, at best, allegations as to discrete and independent employment decisions, however adverse. Such claims are not pervasive enough to be considered as one continuous imposition of hostile work environment, analogous to sexual harassment. Nor is a "purgatory" assignment sufficiently severe to constitute, by itself, a hostile work environment. As previously noted, the fact that DeNovellis remained assigned to "purgatory" cannot constitute a post-Act violation, even though the effects of that assignment decision were prolonged into the post-Act period by the bureaucratic delays emanating from the agency's reorganization. See Evans, 431 U.S. at ___ _____ 558; see Part III.A., supra. ___ _____ DeNovellis correctly points out that the court must focus on the work atmosphere as a whole, and not separate out each demeaning work assignment or derogatory remark for individual analysis. See Vance, 863 F.2d at 1510. ___ _____ Nevertheless, the question is whether he produced enough evidence on the entire summary judgment record to enable a reasonable trier of fact to find a cognizable hostile environment claim. We agree with the district court that he did not.  Williams and others at HHS apparently made some scattered comments that could be construed as evincing -28- 28 racial, ethnic, or age-based hostility, although some of the comments in the record were not made in DeNovellis's presence. DeNovellis does not argue that these comments were severe or pervasive, nor does he claim that they rise to the level of sufficiency necessary to make out a prima facie case of harassment. Rather, he appears to offer them as probative of discriminatory motive underlying his job assignments. The major aspect of his work environment that DeNovellis claims was hostile or "harassing" was his so- called "employment purgatory" of job assignments to positions he considered to be unfit for his level of qualification. As already noted, the "hostile" aspect of remaining in an undesirable job assignment is not akin to a pervasive environment claim; it is a discrete employment decision, however adverse it may be. Even when this is combined with the derogatory comments, we do not think a fact-finder, based on this record, could reasonably conclude that DeNovellis's work environment was so pervaded with racial, ethnic, or age discrimination so as to constitute a violation of Title VII. That DeNovellis would be left without a remedy if we affirm the district court's decision is not a sufficient reason to warrant reversal. The Court in Landgraf was not ________ moved by petitioner's argument there that, "if she [could] not obtain damages pursuant to [the 1991 Act], she [would] be left remediless despite an adjudged violation of her right -29- 29 under Title VII to be free of workplace discrimination." 511 U.S. at 285 n.38. As the Court put it, Title VII "did not create a 'general right to sue' for employment discrimination, but instead specified a set of 'circumscribed remedies,'" and "[u]ntil the 1991 amendment, the Title VII scheme did not allow for damages. We are not free to fashion remedies that Congress has specifically chosen not to extend." Id. (quoting United States v. Burke, 504 U.S. 229, ___ ______________ _____ 240 (1992)). DeNovellis's lack of a remedy (even if there were a violation) is a result of the way Congress had drafted Title VII prior to the 1991 Act; whatever unfairness arose from that limited remedial scheme affected all plaintiffs suing under it.  IV. Exhaustion of Administrative Remedies _____________________________________ DeNovellis argues that the district court erred in dismissing his post-detail deprivation of duties and hostile environment claims because he failed to exhaust his administrative remedies. DeNovellis misconstrues the district court's decision. The court did not grant summary judgment against him based on his failure to exhaust administrative remedies. With respect to the post-Act deprivation of duties the district court stated that "a strong argument" could be made that he has not exhausted his Title VII claim, but the court did not decide the issue. -30- 30 Moreover, with respect to his claim under the ADEA, the court noted that the government had waived any exhaustion argument.7 The district court decided the post-Act deprivation of duties claim on the basis that DeNovellis failed to produce evidence to support a claim of discrimination, sufficient to withstand summary judgment. The district court rejected DeNovellis's hostile work environment claim based on the same reasoning as the pre-Act deprivation of duties (a possible wrong but without a remedy). The court added one sentence stating failure to exhaust as an alternative ground for rejecting this claim, but we need not address that here because we affirm based on DeNovellis's failure to demonstrate a genuine issue as to a severe or pervasive hostile environment.  Thus, we need not reach DeNovellis's exhaustion argument because we uphold the district court's summary judgment ruling as to Title VII and the ADEA based on its reasons other than exhaustion.   ____________________ 7. The government takes the position that the ADEA does not require a federal employee to exhaust his administrative remedies. The Supreme Court has held, in the context of a private employer, that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World _____ ___________ Airlines, Inc., 455 U.S. 385, 393 (1982). Quite possibly ______________ Zipes should apply as well when a federal employee sues a _____ federal agency, see Rennie v. Garrett, 896 F.2d 1057, 1059-60 ___ ______ _______ (7th Cir. 1990) (citing cases); but we need not decide the point definitively in the present case. -31- 31 -32- 32 V. Declaratory Relief and Attorney's Fees ______________________________________ Finally, DeNovellis argues that the district court should have awarded him declaratory relief and attorney's fees. His reasoning, however, is based on a false premise. DeNovellis asserts that the district court  ruled as a matter of law that DeNovellis' "five-month assignment to a financial position for which he had no background was not only a set-up for failure but also an adverse employment action" motivated by illegal discrimination based upon age, race or ethnicity. The internal quotations accurately reproduce the district court's conclusion as to the legal question of whether the sham assignment constituted an adverse employment action within the meaning of Title VII and the ADEA. DeNovellis's assertion after the internal quotation, however, misrepresents what the district court found.  The court held that DeNovellis had presented sufficient evidence on the intent issue to survive a summary judgment motion as to his pre-Act deprivation of duties. The court did not make a conclusive factual finding as to discriminatory intent; that question would be resolved by the trier of fact if the matter went to trial. The court granted the Secretary's motion for summary judgment because the court found that DeNovellis would not be entitled to a remedy even if the case went to trial and he were able to persuade the -33- 33 trier of fact that the defendant was motivated by a discriminatory intent. The difference between what the court actually held and what DeNovellis claims it held is fatal to his argument that the court was obligated to award him a declaratory judgment and attorney's fees.8 If DeNovellis were correct in his characterization of the posture of the case -- that the district court had already made a factual finding of discriminatory intent -- then the court would still have discretion as to whether to grant declaratory relief after finding discrimination at trial. But at least then DeNovellis might be able to persuade us that the district court abused its discretion in denying him declaratory relief and fees.  The Declaratory Judgment Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant"; courts have broad discretion to decline to enter a declaratory judgment. Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (quoting ______ _______________ Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 ___________________________ __________ (1952)). "By the Declaratory Judgment Act, Congress sought  ____________________ 8. Although his complaint did not seek a declaratory judgment, DeNovellis argues that the court had the authority to award such relief under his final prayer for relief, which sought "such other and further relief as may be just and proper." He is correct on this point, but we reject his declaratory judgment argument on other grounds. -34- 34 to place a remedial arrow in the district court's quiver; it created an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants. Consistent with the nonobligatory nature of the remedy, a district court is authorized, in the sound exercise of its discretion, . . . to dismiss an action seeking a declaratory judgment before trial." Wilton, 515 U.S. at 288. Although "federal courts ______ have a 'virtually unflagging obligation' to exercise the jurisdiction conferred on them by Congress," a district court may "nonetheless abstain from the assumption of jurisdiction over a suit in 'exceptional' circumstances" such as where a declaratory judgment is sought regarding an issue currently pending in a state court action. Wilton, 515 U.S. at 284 ______ (quoting Colorado River Water Conservation Dist. v. United _________________________________________ ______ States, 424 U.S. 800, 813, 817-18, 818-20 (1976)). "In the ______ declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration." Wilton, 515 U.S. at 288. But ______ ___ see Steffel v. Thompson, 415 U.S. 452, 468 (1974) ("'[A] ___ ____________________ federal district court has the duty to decide the appropriateness and the merits of the declaratory request irrespective of its conclusion as to the propriety of the issuance of [a requested] injunction.'") (quoting Zwickler v. ________ Koota, 389 U.S. 241, 254 (1967)); Frankfurter & Landis, The _____ ___ -35- 35 Business of the Supreme Court: A Study of the Federal _____________________________________________________________ Judicial System 65 (The federal courts are "the primary and _______________ powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States."). The standard of appellate review of a decision as to declaratory relief is whether the district court abused its discretion. Wilton, 515 U.S. at 289. Thus, if the ______ district court actually found discriminatory intent in DeNovellis's deprivation of duties, we might or might not find that the denial of a declaration to that effect was an abuse of discretion. Cf. Metropolitan Stevedore Co. v. ___ ____________________________ Rambo, 117 S. Ct. 1953 (1997) (nominal damages permitted in _____ Longshore and Harbor Workers' Compensation Act case in order to preserve right to receive future benefits). Because the district court found that the question of discriminatory intent was a triable issue, without reaching any conclusion as to whether such intent actually existed, our review of its denial of declaratory relief is in a different posture. The court faced the possibility of conducting a trial in this case, assessing arguments and counter-arguments as to what people intended by certain statements or actions, with no opportunity to award any relief to DeNovellis that would remedy the harm he allegedly suffered. After trial, the court might possibly have the authority to enter a declaration that some or all of the -36- 36 defendant's now-terminated employment actions were discriminatory. In the circumstances of this case, the district court's decision -- prior to trial -- to refrain from such a fruitless endeavor was within its discretionary power. See Wilton, 515 U.S. at 288. ___ ______ Because DeNovellis has no entitlement to a declaratory judgment and because we have affirmed the denial of other relief, he has not prevailed on any issue in the case and attorney's fees may not be awarded. See 42 U.S.C.  ___ 1988; Texas State Teachers Ass'n v. Garland Indep. Sch. ____________________________ ____________________ Dist., 489 U.S. 782, 791-92 (1989) (A litigant is a _____ prevailing party if he "has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit.'") (alteration in original) (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir. ______ ________ 1978)). Conclusion __________ Title VII and our other antidiscrimination laws serve essential societal goals. See Aikens, 460 U.S. at 716. ___ ______ If America stands for anything in the world, it is fairness to all, without regard to race, sex, ethnicity, age, or other immutable characteristics that a person does not choose and cannot change. We have recently had occasion to note that "Title VII is one of the brightest stars in the firmament of this nation's antidiscrimination laws." Serapion v. ________ -37- 37 Martinez, ___ F.3d ___, ___, 1997 WL 394605, at *2 (1st Cir. ________ July 18, 1997).  The standards for summary judgment are highly favorable to the party opposing such a motion, and issues of motive often present fair factual disputes properly resolved by a factfinder after trial. Nevertheless, in this instance the dearth of evidence is simply too great and summary judgment was properly granted. The judgment of the district court is Affirmed. Affirmed ________ -38- 38