Janowicz v. Martin, et al.          CV-97-336-M    02/05/99

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Joseph Janowicz,
      Plaintiff

      v.                                        Civil No. 97-336-M

Leo Martin; Joseph Panarello;
and State of New Hampshire
Department of Corrections,
      Defendants


**O R D E R**


Defendant State of New Hampshire Department of Corrections (the "Department") moves for summary judgment in this suit alleging sexual harassment in violation of Title VII of the Civil Rights Act of 1964, as amended.[1]  See 42 U.S.C. § 2000e-2(a)(1). For the reasons that follow, the Department's motion is denied.


Standard of Review

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

---

[1]Plaintiff's complaint also included state law claims for violation of state civil rights contrary to R.S.A. 354-A-7; constructive discharge; negligent supervision, training and retention; battery; intentional infliction of mental distress; and invasion of privacy.  The complaint also named two individuals, Leo Martin and Joseph Panarello, as defendants.  On November 25, 1997, the court granted defendants' partial motion to dismiss the Title VII claims against the individual defendants and the state law claims against all defendants, without prejudice to bringing the state law claims against the Department in state court.  The only remaining claims, therefore, are the Title VII claims against the Department.

56(c). When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party carries its burden, the burden shifts to the nonmoving party to demonstrate, with regard to each issue on which it has the burden of proof, that a trier of fact could reasonably find in its favor. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997).

At this stage, the nonmoving party "may not rest upon mere allegation or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue" of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship

2

<u>Green Nursing Center</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

<u>Background</u>

Viewed in the light most favorable to plaintiff, the facts are as follows. At all times relevant to this action, plaintiff held the rank of corporal in the Department's hierarchy and was assigned to the day shift on the Secure Psychiatric Unit ("SPU"). Plaintiff primarily worked on the SPU's third floor.

Sergeant Leo Martin also worked the day shift on the SPU. As a sergeant, Martin was superior to plaintiff in rank. Martin's duties were primarily administrative, and he usually worked on the SPU's fourth floor. Occasionally, however, Martin was the officer in charge on the third floor and therefore, at times, he acted as plaintiff's direct supervisor. Martin himself worked for, among others, Administrative Director Joseph Panarello.

Plaintiff's usual supervisors were Sergeants Kevin Gathercole and Jeff Kennett. Plaintiff had a good working relationship with Gathercole, but thought that Kennett had held a grudge against him ever since an incident in which plaintiff turned off the light in an elevator in which Kennett was riding. Since that time, Kennett was constantly trying to write plaintiff up and get him in trouble. Plaintiff felt that Kennett treated him differently than other corporals.

Plaintiff considered working on the SPU, which involved dealing with psychotic persons, to be dangerous and stressful. One experience plaintiff found particularly disturbing was having to cut down a patient who had tried to hang himself.

Beginning in November, 1995, Martin began asking plaintiff to go out to dinner or to go to Martin's house for dinner. He extended each invitation five or six times over the next three months. Each time, plaintiff declined.

One December morning in 1995, while plaintiff was stationed at the entrance gate, Martin grabbed plaintiff's buttocks while plaintiff was opening the gate for Martin. Martin made a comment to the effect that plaintiff had "nice buns." Although plaintiff said nothing to Martin at the time, he telephoned Martin later that day and told Martin he considered such conduct offensive and requested that Martin not repeat it.

On a day in January, 1996, plaintiff was standing with other employees at the nurses' station in the SPU when Martin approached him from behind and grabbed his genitals. Plaintiff, upset by the experience, called Martin a "dirty bastard" or something similar and walked away. Martin laughed and stated that plaintiff had a "nice piece of Polish sausage." About a week after this incident, plaintiff began having flashbacks and nightmares about sexual abuse he had suffered as a child.

On another occasion in January, 1996, while plaintiff was seated at a desk, Martin again approached him from behind and

4

began massaging his neck. While doing so, Martin told plaintiff he could go a long way in the Department with Martin's help.

Toward the end of February, 1996, plaintiff asked to take two days off. Kennett agreed to let plaintiff take the first day, but said he was unsure of staffing needs for the second day and would call plaintiff in the morning if plaintiff was needed. On the afternoon of the second day, plaintiff found out that he was missed at work and that Kennett denied signing plaintiff's leave slip. This incident, in plaintiff's words, "put [him] over the edge." He called his psychiatrist, who told him to stay out of work.

Plaintiff took a disability leave for mental stress. On February 29, 1996, he submitted an accident/injury reporting form with an attached statement detailing the causes of his stress. These causes included being unfairly treated by Kennett and another superior, Lieutenant McGill, finding the patient who had tried to hang himself, and being touched by Martin on several occasions in sexually harassing ways.

On March 5, 1996, Department employee John J. Kovacs called plaintiff to inquire further about the alleged sexual harassment. Kovacs asked plaintiff to provide a written statement detailing the incidents of sexual harassment, and plaintiff did so. The Department conducted a sexual harassment investigation, taking witness statements from numerous Department employees. A report of the investigation, submitted on March 21, 1996, contained findings that the touchings reported as the first and third

5

incidents (grabbing plaintiff's buttocks and massaging his neck) likely did occur but, under the circumstances, did not constitute sexual harassment. It was also found, however, that Martin did touch plaintiff's genitals and that conduct did constitute sexual harassment. On April 1, 1996, Martin was suspended without pay for 15 days due to his unprivileged touching of plaintiff.

Plaintiff has been diagnosed as suffering from Major Depressive Disorder and Post Traumatic Stress Disorder and has at times been suicidal. His symptoms have prevented him from returning to work at the Department. In June, 1996, plaintiff's employment with the Department was formally terminated for nondisciplinary reasons, namely, that because of a medical condition, his presence in the workplace is deleterious to his health.

## Discussion

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1)(1994). Sexual harassment is a form of discrimination based on sex. See Provencher v. CVS Pharmacy, Div. Of Melville Corp., 145 F.3d 5, 13 (1st Cir. 1998). Furthermore, the Supreme Court held in Oncale v. Sundowner Offshore Serv., Inc., __ U.S. __, __ 118 S.Ct. 998, 1001-02

(1998), that same-sex sexual harassment, such as that alleged here, is prohibited by Title VII.

Plaintiff claims that he has suffered both quid pro quo and hostile work environment harassment. The Supreme Court, however, has recently diminished the significance of the labels "quid pro quo" and "hostile work environment." The Court explained that "[t]he principal significance of the distinction is to instruct that Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment and to explain the latter must be severe or pervasive." Burlington Indus., Inc. v. Ellerth, __ U.S. __, __ 188 S.Ct. 2257, 2264 (1988). Discrimination is explicit when an employer conditions employment benefits on submission to sexual advances, see id., conduct commonly described as quid pro quo harassment. What Burlington clarified is that when such discrimination does not result in a tangible employment action it must meet the severe or pervasive requirement:

> When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive.

Id. at 2265. The Court also explained that once actionable discrimination is proved, an employer's vicarious liability for harassment by its employee is not determined by the concepts of quid pro quo and hostile work environment but by the factors set forth in Burlington. Id.

7

Burlington itself involved an employee who resisted unwelcome sexual advances by a supervisor but suffered no negative tangible employment consequences. Id., 118 S.Ct. at 2262. The Court held that where the actions complained of involve only unfulfilled threats, the case "should be categorized as a hostile work environment claim which requires a showing of severe or pervasive conduct." Id. at 2265.

The instant case is analogous. The third alleged incident of harassment - in which Martin massaged plaintiff's neck and told him he could go a long way in the Department with Martin's help - appears to set up a potential quid pro quo situation: the conditioning of a job benefit on submission to the unwelcome sexual advances of a superior. However, plaintiff has presented no credible evidence that his resistance to those advances resulted in any tangible employment action.

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington, 118 S.Ct. at 2268. Plaintiff argues that a tangible employment action occurred, because the stress caused by Martin's harassment caused plaintiff to leave the Department and eventually led to termination of his employment. However, plaintiff's voluntary exit from the Department, even if motivated by stress resulting from the harassment, is not a tangible employment action. See Sconce v. Tandy Corp., 9 F. Supp. 2d 773,

8

776 (W.D. Ky. 1998) (no tangible employment action where plaintiff voluntarily requested transfer to a lower paid position because of anxiety caused by the harassment). "To create . . . liability in what is referred to as a quid pro quo 'refusal' claim, the supervisor must do something in addition to making sexual advances. He must do something else which causes or creates a job detriment." Id.; see also Burlington, 118 S.Ct. at 2269 ("A tangible employment decision requires an official act of the enterprise, a company act.").

Plaintiff does point to one action by Martin which he claims to be tangible employment action. Plaintiff cites Martin's deposition testimony in which Martin opines that plaintiff left the Department because Martin caught plaintiff stealing state time and reported it to the Lieutenant in charge who then engaged in an angry confrontation with plaintiff, which caused plaintiff to leave the Department. Plaintiff argues that "[a] jury could reasonably conclude that Sgt. Martin's investigating, determining and reporting to the Lieutenant in charge for action that the plaintiff was 'stealing state time' was conduct taken by Sgt. Martin in response to plaintiff's rejection of Sgt. Martin's sexual advances." Plaintiff further argues that this could be construed as tangible employment action.

The court disagrees. Even if Martin's conduct was retaliatory, there is no evidence that Martin caused plaintiff to be fired or disciplined, or resulted in any other tangible employment action by the Department. All that is alleged is

9

speculation that the consequences of Martin's allegedly retaliatory actions caused plaintiff to voluntarily leave the Department. As noted above, that is insufficient to constitute an adverse employment action. See Sconce, 9 F. Supp. 2d at 776. Moreover, it is contradicted by plaintiff's own testimony that it was the confrontation with Kennett over the two day leave that put plaintiff "over the edge" and caused him to leave the Department. A confrontation over allegedly stolen state time is not even mentioned as one of the causes of plaintiff's stress in the three page statement appended to his accident/injury reporting form.

Plaintiff has failed to establish the existence of any genuine issue of material fact regarding tangible employment action. Thus, plaintiff's alleged incidents of harassment must qualify as severe or pervasive under the rubric commonly called hostile work environment. See Burlington, 118 S.Ct. at 2265; see also Sconce, 9 F. Supp. 2d at 775-76 (where supervisor conditioned job benefits on sexual favors but plaintiff's refusal resulted in no adverse consequences, claim was for hostile work environment not quid pro quo harassment).

A claim of hostile work environment requires a showing that the harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (internal quotation marks and brackets omitted). Whether a work environment is hostile or abusive is to be

10

determined from the totality of the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Moreover, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, __ U.S. __, __ 118 S.Ct. 2275, 2283 (1998).

The Department asserts that Martin's conduct, though crude and vulgar, was not severe or pervasive enough to create a hostile work environment. The Department states that horseplay involving physical contact was not uncommon among the male staff of SPU, and included such acts as tickling and pats on the buttocks.

The court finds, however, that plaintiff has presented evidence from which a reasonable jury could find a hostile work environment. Plaintiff has alleged incidents of demeaning and humiliating physical touching in the workplace which included grabbing his genitals. Equal Employment Opportunity Commission ("EEOC") guidelines presume that "a physical, forced groping of an intimate part of the Plaintiff's body . . . creates an actionable hostile work environment." Fall v. Indiana Univ. Bd. of Trustees, 12 F. Supp. 2d 870, 879 (N.D. Ind. 1998) (citing

11

EEOC Policy Guidance on Sexual Harassment ("EEOC Policy"), 8 Fair Emp. Prac. Man (BNA) 405:6691 (March 19, 1990)); see also DeNovellis, 124 F.3d at 311 (looking to EEOC Policy in determining whether harassment is severe or pervasive). Plaintiff has at least raised a genuine issue of fact as to whether Martin's harassment of him was severe or pervasive enough to be actionable under Title VII.

The Department also argues that it is entitled to summary judgment, even if the harassment was severe or pervasive, because it is neither vicariously nor directly liable for determining Martin's harassment of plaintiff. The standard for determining vicarious liability is set forth in Burlington and Faragher:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Burlington, 118 S.Ct. at 2270; Faragher, 118 S.Ct. at 2292-93.

Plaintiff does not dispute that the Department had a sexual harassment policy in place at the time of Martin's offending conduct. Plaintiff struggles against the tide, however, by arguing that it was not an effective policy because "sexual harassment was not taken seriously" in the Department, and the staff was afraid of retaliation for reporting sexual harassment.

12

Plaintiff offers the testimony of two witnesses who saw Martin grabbing plaintiff's genitals and who claim that they suffered retaliation after giving statements about the event. Plaintiff also says he did not believe anything would have been done had he complained earlier, given that unfair treatment of him by other officers had also gone unaddressed.

These after-the-fact speculations, however, are insufficient to counter the Department's conclusive evidence establishing that plaintiff did make a complaint, that an investigation was conducted promptly, that witnesses were not deterred from making statements, and did in fact make statements, and that after the facts were determined by the agency the accused harasser was disciplined - in other words, that the policy, at least in plaintiff's case, was effective. Plaintiff has failed to raise any genuine issue of material fact as to whether the Department had an effective sexual harassment policy in place; the Department has therefore satisfied the first prong of the affirmative defense. See Jones V. USA Petroleum Corp., 20 F. Supp. 2d at 1355 (noting that "the effective promulgation of a workable anti-harassment policy satisfies the first element's reasonable care standard.")

It is also undisputed that plaintiff did not report Martin's harassing conduct until after plaintiff left the Department due to stress. Plaintiff concedes that "[e]mbarrassment was a major factor" in his failing to immediately report the harassment. Mere embarrassment cannot provide a reasonable excuse for failing

to invoke the protection of a workable anti-harassment policy put in place by the employer. Cf. Sconce, 9 F. Supp. 2d at 778 (finding "a threat of termination, without more, is not enough to excuse an employee from following procedures adopted for [his] protection"). Plaintiff has failed to raise any genuine issue of material fact as to whether he unreasonably failed to utilize the Department's policy and procedures for reporting and remedying sexual harassment. The court finds as a matter of law that the Department has established the elements of the affirmative defense to vicarious liability described in Burlington and Faragher.

If only vicarious liability were at issue, the Department would be entitled to summary judgment. However, plaintiff also makes a claim based on the Department's own negligence in failing to remedy sexual harassment of which it had knowledge. "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." Burlington, 118 S.Ct. at 2267. Plaintiff essentially claims that the Department should have known of and remedied Martin's harassment of him before he complained. As neither Burlington nor Faragher resolved claims of direct employer negligence, that theory of liability remains intact. See Burlington, 118 S.Ct. at 2267 ("Negligence sets a minimum standard for employer liability under Title VII; but Ellerth seeks to invoke the more stringent standard of vicarious liability."); Faragher, 118 S.Ct. at 2294 (noting that "the

14

reversal necessary on the theory of supervisory harassment renders any remand for consideration of imputed knowledge entirely unjustifiable (as would be any consideration of negligence as an alternative to a theory of vicarious liability here)").

The Department argues that it was not negligent because it did not know Martin was harassing plaintiff until he made a complaint, and, once it received the complaint, it took prompt and effective remedial action. The Department asserts that there is no evidence that it knew or even should have known of Martin's harassing behavior.

Plaintiff, however, advances two bases for charging the Department with prior knowledge. Plaintiff first contends that the Department should have known of Martin's generally harassing behavior because some evidence suggests the Department may have been aware of similar offensive physical contact by Martin with other male employees, well before the incidents involving plaintiff. Plaintiff also claims that the Department should have known Martin was harassing him because the genitals-grabbing incident was witnessed by other officers, including a "superior officer," Sergeant Gathercole. Plaintiff then imputes the knowledge of these witnesses to the Department itself.

Neither party has adequately briefed the negligence issue, or provided the court with a sufficient record to even determine whether any genuine issue of material fact exists. For example, plaintiff submitted deposition testimony by Sergeant Gathercole

15

in which he purported to recall a conversation among two other sergeants and himself during which one sergeant supposedly stated that a named corporal had complained to him that she had, in turn, received a complaint from a corrections officer to the effect that Martin frequently touched him.  Gathercole stated that he reported that information to the Administrative Director, Joseph Panarello, and that his concerns were essentially brushed aside.  The evidence is unclear, however, as to when Gathercole notified Panarello of these attenuated reports of Martin's harassing others.  Gathercole's affidavit implies that he notified Panarello at the time of the conversation.  His deposition testimony, on the other hand, suggests that he spoke to Panarello before plaintiff left the Department, which suggests a more recent date.  Similarly, plaintiff cites as incriminating evidence a note apparently written by Marilee Nihan, the investigator assigned to plaintiff's complaint, that "Leo [Martin] likes young guys."  However, plaintiff provides no evidence suggesting when the notation was made.

The Department, in turn, merely declares that the existence of rumors cannot suffice to impute knowledge of Martin's propensity for, or engagement in, sexual harassment.  The Department cites no legal authority for, nor does it develop that position.

Plaintiff also submitted evidence tending to establish that Sergeant Gathercole actually witnessed the genitals-grabbing incident.  Neither party, however, has adequately addressed the

16

legal bases for imputing or not imputing Gathercole's knowledge to the Department.  In the absence of an adequate factual record and sufficiently developed legal argument by the parties, the court simply cannot resolve these issues on summary judgment.  Since the Department's motion for summary judgment reaches beyond vicarious liability, to that extent it must be denied.  As to plaintiff's claims asserting vicarious liability theories, however, the Department's motion is granted.

<u>Conclusion</u>

For the foregoing reasons, the Department's motion for summary judgment (document no. 14) is denied in part and granted in part.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

February 5, 1999

cc:  James F. Lafrance, Esq.
     Martha A. Moore, Esq.

17