USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 
 

No. 97-2388

 JOHANNA THOMAS,

 Plaintiff, Appellant,

 v.

 CONTOOCOOK VALLEY SCHOOL DISTRICT AND 
 SCHOOL ADMINISTRATIVE UNIT NO. 1.,
 
 Defendants, Appellees.
 

 APPEAL FROM THE UNITED STATES DISTRICT COURT
 
 FOR THE DISTRICT OF NEW HAMPSHIRE
 
 [Hon. Shane Devine, Senior U.S. District Judge]
 

 Before
 
 Torruella, Chief Judge,
 Bownes, Senior Circuit Judge,
 and Stahl, Circuit Judge.
 
 

 James F. Allmendinger, Staff Attorney, NEA-New Hampshire, for
appellant.
 John H. Vetne, with whom Sheliah M. Kaufold, William J.
Phillips, and Blodgett, Makechnie & Vetne were on brief, for
appellees.

 
 
 July 24, 1998
 
 
 
 
 

 STAHL, Circuit Judge. Plaintiff-appellant Johanna Thomas
appeals the grant of summary judgment to defendants-appellees
Contoocook Valley School District and School Administrative Unit 1
(collectively, the "School Board") on her claim that her teaching
contract was not renewed in violation of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. 12101 et seq. This appeal
involves the extent to which findings made during state
administrative proceedings in which Thomas contested her dismissal
have preclusive effect in federal court. The district court found
that factual findings made by the defendant School Board, which
were reviewed by the New Hampshire State Board of Education ("State
Board") and the New Hampshire Supreme Court ("NHSC") conclusively
established that the reason for her nonrenewal was
nondiscriminatory. We disagree and reverse. 
 I. Background
 On a motion for summary judgment, we recite the facts in
a light most favorable to the nonmovant, Thomas. DeNovellis v.
Shalala, 124 F.3d 298, 305-06 (1st Cir. 1997). 
 Thomas began teaching in the Contoocook Valley School
District in the early 1980s. From 1987 to 1989, Thomas received
generally satisfactory evaluations of her performance, which
described her as "a teacher who is building a solid program in her
room as well as solid relationships with the children and their
parents." These evaluations, which were conducted by various
administrators, commended Thomas for such attributes as her
enthusiasm, desire to improve, and ability to keep classroom
interest high. The evaluations noted some problems, however,
including her failure to arrive at school "during the expected time
in the morning before school begins," and some difficulties with
"large group classroom management." A later evaluation concluded
that these problems had been resolved.
 In September 1989, Thomas underwent throat surgery for
the removal of polyps from her voice box, which made her voice
sound persistently hoarse. In addition, she was forced to take an
extended sick leave and missed a substantial amount of the 1989-90
school year.
 When Thomas returned, she had problems arriving at school
on time. On December 12, 1990, Principal Anita Willard (now
Prud'homme) wrote Thomas a note complaining that Thomas was
persistently late to school and warned her that Willard "just
couldn't have this happening in this school." On March 19, 1991,
Willard informed Larry Bramblett, the Superintendent, of her
problems with Thomas. In addition, Willard excoriated Thomas in a
letter to her, in which she wrote: 
 This letter is to inform you that the issue
 surrounding your lateness to school, meetings,
 and duties has reached a point where I can no
 longer handle it. . . .
 On Monday when you arrived at 9:15 with
 no excuse, I had already talked on the phone
 with a parent who wanted to talk to you before
 school about her child. . . . Your class when
 it arrived was unsupervised, you know that
 this has happened before, and given the nature
 and age of your children this is totally
 unacceptable. 
 The other problem concerns the staff
 meeting that was changed to fit your schedule.
 . . . [E]veryone else was on time except you. 
 . . . 
 I think you understand that our job
 requires us to be here at certain hours, cover
 our school duties, attend meetings on time,
 pass in work such as testing, budget items,
 report cards etc. 
 It often feels to me that it requires
 too much supervision on my part to see that
 you do your job. 

The letter warned that Bramblett was expecting a call from Thomas
within a week to discuss the situation. The next week, Bramblett
sent a letter to Thomas, saying that her job was "in jeopardy" and
that "her attendance particularly tardiness has placed your
teaching performance in an unsatisfactory condition." He warned
that "another incident regarding your classroom attendance or
unfounded absenteeism will result in . . . immediate dismissal."
 During the next school year, Thomas's teaching
performance was observed and evaluated in the normal course of
evaluations. The school district utilized teacher performance
observation forms that allowed an observer to rate a teacher
"satisfactory," "not satisfactory," or "not observable" in regard
to twenty different attributes of classroom performance, such as
"demonstrates knowledge of subject matter" and "prepared in advance
of lesson." During the 1991-92 school year, Willard conducted
observations of Thomas's classroom performance on February 7 and
12, 1992. She rated Thomas "satisfactory" or "not observable" in
all categories. Thomas's overall evaluation for the 1991-92 school
year, also conducted by Willard, recommended that Thomas be renewed
for the following year. The evaluation suggested that Thomas work
on "classroom management, learning techniques to keep all students
focused and on task," but commended her for improving her attitude
toward "non-instructional issues," such as paperwork, due dates,
working with other staff, and testing duties. 
 Subsequently, on several occasions after Willard
recommended renewal, Bramblett expressed concern over Thomas's
voice problems. He wrote Thomas on March 13, 1992, explaining that
a number of parents had complained about her teaching performance
and that at least one was "concerned about her child understanding
you with your recent voice problems." On May 21, 1992, Bramblett
explained in a memorandum to Thomas that he had called Thomas's
doctor "regarding the chronic or apparent chronic condition of your
voice" and noted parents' complaints "regarding student
comprehension from your verbal instructions." On June 6, 1992,
Thomas saw her doctor, who described her condition as "chronic
laryngitis," and recommended "intensive speech therapy with a
change in voice habits that reduces strain on the vocal chords." 
On June 17, 1992, Bramblett criticized Thomas for not obtaining
medical advice in a timely manner and tied her voice problems to
her classroom performance. He stated:
 I have felt all along that you have not
 grasped the seriousness of the matter before
 you. Although I recommended seeing your
 doctor a month ago, only now have you decided
 to seek medical advice regarding your voice.
 My classroom observations still leave me
 uncertain as to your specific problem -
 control issues because children cannot detect
 the inflection in your voice, or if control is
 a chronic condition unaffected by a physical
 problem. . . . I again urge you to consider
 Long [sic] term disability insurance and
 taking at least a year off before I begin
 evaluating your tenure in this district. 

He then informed her that she was being transferred from Hancock
Elementary school, where she had taught a combined grade class, to
Antrim Elementary School, to teach in a second grade class. On
August 3, 1992, Bramblett, in a letter summarizing a recent meeting
between them, required Thomas to get a second opinion on her voice,
and a "general release" certifying both that her voice "ha[d]
improved to the point that [she could] communicate in normal
fashion with children ranging in ages from six to nine years old"
and that her condition "is not expected to regress." Bramblett
threatened that her failure to obtain these assurances "would
result in a temporary or permanent loss of employment." 
 Thomas subsequently obtained a letter from the
Massachusetts Eye and Ear Infirmary which recounted her "persistent
hoarseness," but noted that her "phonation" had improved due to
speech therapy, and expressed the hope that "an entire summer of
voice rest and continued speech therapy . . . as well as Vanceril
inhalers . . . may significantly improve the quality of her voice
by September." 
 On October 27, 1992, Bramblett placed a "Warning Memo" in
Thomas's permanent record file. The memo specifically incorporated
by reference his prior correspondence with Thomas concerning her
voice, describing them as "evaluations," and recounted his
observations during a forty minute classroom visit. He complained
that "students were not well focused," and "not well engaged." He
criticized a math lesson, and noted that his "concern persists
about classroom control, effective use of time, and development of
consistent well defined lessons." He advised, "Each of these areas
define my focus for observations between now and March 1, 1993."
Yet Bramblett didn't observe Thomas's class again until February
19, 1993. On February 26, 1993, Bramblett wrote a letter informing
Thomas that he had decided not to renominate her "at the School
Board renomination meeting on March 16, 1993," explaining that his
"last observation of February 19, 1993 showed no substantial
improvement of the concerns expressed in November." The letter
cited three reasons as the bases for his decision: a lack of
classroom control, ineffective use of class time, and poor lesson
development. 
 On March 29, 1993, Keith R. Burke, the Assistant
Superintendent, notified Thomas in writing that the School Board
had not re-elected her for the upcoming school year, and informed
her that she had the right under N.H. Rev. Stat. Ann. ch.189:14-a
to a hearing before the school board and to obtain a statement of
reasons, in writing, for the Board's decision not to re-elect her. 
His letter also advised Thomas that the School Board would issue
its decision fifteen days after the close of the hearing. Thomas
asserted her right to a hearing, which was held on August 26, 1993. 
 At the hearing, Thomas was represented by counsel,
introduced documentary evidence, called witnesses, and cross-
examined Bramblett and Willard, both of whom testified against her.
A number of parents testified on Thomas's behalf, describing
positive experiences their children had had with Thomas. The rules
of evidence were relaxed. After reviewing the evidence, ten of the
eleven School Board members voted unanimously to approve their
nonrenewal decision (the eleventh board member was not in
attendance at the vote). As required by chapter 189:14-a, the
School Board provided a statement of reasons for its decision,
which the Board denominated as "findings": (1) Thomas had adequate
notice of Bramblett's concern about her performance; (2) Thomas's
tardiness had no direct bearing on her nonrenewal and "the
tardiness ceased after Bramblett's warning of March 27, 1991"; (3)
the Board characterized as "incredible" Thomas's testimony that she
was not aware, prior to Willard's 1990 letter, of the requirement
that she be in her class by 8:30 a.m.; (4) Thomas's health had "no
direct bearing" on her nonrenewal; (5) Willard had "significant
concerns" about Thomas's effectiveness, which the Board found
"persuasive"; and (6) although many parents and their children had
positive experiences with Thomas, the Board had to give Willard's
and Bramblett's testimony greater weight. Based on these stated
reasons, the School Board concluded:
 The Board finds . . . that the administration
 has proven its case by a preponderance of the
 evidence. 
 The Board finds that Mrs. Thomas's
 classroom performance suffered from
 significant problems, including in the areas
 of lack of discipline, poor use of time and
 poor development of lessons, which issues the
 Board finds to be inextricably inter-related.
 The Board finds that it lacks
 sufficient evidence to determine whether or
 not Mrs. Thomas's voice was a factor in the
 problem of classroom control. 

 Plaintiff appealed the School Board's decision to the
State Board pursuant to N.H. Rev. Stat. Ann. ch.189:14-b, asserting
that the School Board's stated reasons were not supported by
substantial evidence. Specifically, in regard to the role that her
voice problems played in the nonrenewal decision, Thomas asserted
that:
 The school board improperly relied upon
 criticisms of Mrs. Thomas related to her voice
 problems, despite clear evidence that Mrs.
 Thomas's voice problems did not interfere with
 her ability to teach, and to that effect the
 school board erred when it concluded that "the
 issue of Mrs. Thomas's health had no direct
 bearing on her nonrenewal."

The State Board has administrative authority to review the School
Board's decision, and to reverse that decision and order
reinstatement if the "substantial rights of the teacher have been
prejudiced because the administrative findings, inferences,
conclusions, or decision are . . . in violation of constitutional
or statutory provisions . . . [or c]learly erroneous in view of
the reliable, probative, and substantial evidence on the whole
record." N.H. Code Admin. R. Ed. 202.06(e)(1), (5). The State
Board interprets this regulatory authority as authorizing a limited
review to determine whether (1) a nonrenewed teacher has received
the required procedural process (that is, notice and hearing); (2)
the School Board's findings of fact supporting the reason for this
dismissal are clearly erroneous; and (3) the "reasons given are
arbitrary, capricious or contrary to law." In re Carolyn Ellis v.
Dover Sch. Bd., Findings and Recommendations of Review Board, at 4-
5 (N.H. Bd. of Ed. undated slip opinion) (emphasis added), aff'd,
No.94-509, slip op. (N.H. February 2, 1996) (referred to as the
"Ellis decision"). Notably, there are no substantive standards
governing teacher renomination or reelection set forth in N.H. Rev.
Stat. Ann. ch.189:14-a. See id. at 2. Thus, it seems that a
school board may refuse to renew a teacher's contract on any basis
so long as the reasons it provides are supported by evidence and
are not contrary to law. 
 When Thomas appealed to the State Board, the parties
agreed to present her arguments to a hearing officer (rather than
to a three person review board), who permitted each party to
present two witnesses and to cross-examine the other party's
witnesses. The hearing officer reviewed the record developed
before the School Board, including the hearing transcript and the
submitted exhibits. He recommended to the State Board that it
uphold Thomas's nonrenewal. The hearing officer concluded that the
School Board's stated reason for Thomas's nonrenewal--that her
classroom performance suffered from significant problems--was, "in
accordance with the Ellis decision, . . . entitled to due deference
if reasonably based on sufficient evidence, which it was." At the
same time, however, he vacated the findings concerning the effect
of Thomas's voice on the School Board's nonrenewal decision. The
hearing officer explained his decision as follows:
 [T]he Board found "that the issue of Mrs.
 Thomas' health ha[d] no direct bearing on her
 nonrenewal", and yet further on in the
 decision it concluded . . . that there was not
 "sufficient evidence to determine whether or
 not Mrs. Thomas' voice was a factor in the
 problem of classroom control." These are
 inconsistent findings.
 . . . . 
 Clearly, Mrs. Thomas' voice problems since her
 1989 vocal chord surgery have been a
 persistent concern of the district and some
 parents, generally expressed to Mrs. Thomas in
 terms of her apparent difficulty communicating
 effectively with her students, a critical
 component of classroom control. 
 Counsel for the district acknowledged
 at the hearing before the undersigned that the
 ability of students to clearly hear what their
 teacher is saying before they can hope to
 comprehend what she is attempting to teach
 them . . . is fundamentally necessary in any
 classroom. Mrs. Thomas' perceived deficits in
 this regard have been, he argues, a legitimate
 source of concern of the district. 
 Whether the extent of the district's
 reliance on the concern in reaching the
 nonrenewal decision here was permissible under
 RSA 354-A:7I [state discrimination law] is a
 fact-sensitive question best left to the
 Commission for Human Rights before which Mrs.
 Thomas currently has pending an employment
 discrimination claim. While that agency is
 best suited to determine the legitimacy of the
 district's position regarding Mrs. Thomas'
 voice impairment, it is clear from the record
 in this matter that her health problems were a
 factor in the Superintendent's nonrenewal
 decision. 
 
 
The hearing officer concluded that the School Board's finding that
Thomas's voice had no direct bearing on her discharge was "not
supported by the record." 
 After the State Board requested additional explanation,
the hearing officer expounded on his bifurcated recommended
decision in a letter that was incorporated into the State Board's
final decision. 
 Four times between March and August 1992 the
 Superintendent wrote to Mrs. Thomas, linking
 her voice impairment to what he perceived to
 be her problems controlling her classroom.
 . . . 
 The evidence . . . at a minimum suggests that
 Mrs. Thomas' voice impairment was felt by the
 Superintendent to very likely contribute to
 her inability to control her classroom and to
 be comprehended by students. 
 . . . 
 At best, the local school board should have
 concluded that it lacked sufficient evidence
 to determine whether her health had a direct
 bearing on her discharge. 

In a 4 to 3 vote, the State Board accepted the hearing officer's
recommended decision and affirmed the decision of the School Board.
The School Board adopted the hearing officer's findings as its own,
including the hearing officer's determination that the
discrimination issue was best left to the New Hampshire Commission
for Human Rights ("Commission").
 Thomas petitioned for certiorari to the NHSC, raising
four questions, including "Whether a school district may violate
its own evaluation policies and thereupon nonrenew a teacher for
reasons apparently related to the teacher's speech disability." 
The NHSC granted Thomas's petition to hear this question, and
summarily affirmed the State Board's decision without explanation. 
 After obtaining the requisite right-to-sue letter from
the EEOC, plaintiff filed suit in the United States District Court
for the District of New Hampshire, alleging that the School Board's
decision not to renew her teaching contract violated the ADA. 
 The defendant moved for summary judgment on the ground
that plaintiff's claim was barred by the doctrine of collateral
estoppel. The district court granted defendant's motion. The
court reasoned that, under Price Waterhouse v. Hopkins, 490 U.S.
228, 242 (1989), "an employer may escape liability by proving that
it would have engaged in the challenged conduct even if it had not
taken disability into account." Relying on the legal proposition
that "the findings of administrative agencies may be accorded
preclusive effect under the doctrine of collateral estoppel," the
district court "accorded collateral estoppel effect to the School
Board's findings of the reason for Thomas's termination," which, in
the court's view, precluded her from establishing that unlawful
discriminatory animus was the "but for" cause of her termination.
As the district court explained:
 The School Board's findings, which plaintiff
 is estopped from denying, establish that the
 superintendent would have fired Thomas
 regardless of whether or not he took her
 disability into account. The Board reportedly
 found "that Mrs. Thomas' classroom performance
 suffered from significant problems, including
 in the areas of lack of discipline, poor use
 of time and poor development of lessons." The
 Board of Education pointed out that "the local
 board did have evidence that Mrs. Thomas's
 teaching performance in the three areas of
 classroom control, lesson planning and use of
 time was considered deficient by her teaching
 principal." Based on these findings, it is
 clear that Thomas's poor performance provided
 sufficient grounds to terminate her,
 regardless of her disability.

See No. 96-414, slip op. at 5-6 (D.N.H. Nov. 5, 1997). Thomas
appeals. 
 II. Discussion
 Plaintiff contends that the district court erred by
holding that the stated findings of the School Board established
conclusively the reason for her dismissal. She argues that,
although the School Board provided a statement of reasons for her
dismissal, the issue of whether Thomas had been the victim of
discrimination was not actually decided in the state proceedings. 
As a result, she maintains, there was no finding with regard to the
critical factual dispute in the case, and she is therefore not
collaterally estopped from litigating that issue in federal court. 
We agree. 
 28 U.S.C. 1738 governs the preclusive effect of state
judicial proceedings in subsequent federal court actions and
extends to the federal courts the principles embodied in the Full
Faith and Credit Clause of the Constitution. "Section 1738
requires federal courts to give the same preclusive effect to state
court judgments that those judgments would be given in the courts
of the State from which the judgments emerged." Kremer v. Chemical
Constr. Corp., 456 U.S. 461, 466 (1982). In the absence of a state
court judgment, section 1738 does not apply, and whether state
agency findings are accorded preclusive effect in a subsequent
civil rights action is a question of statutory interpretation: did
Congress, in enacting the relevant civil rights statute, intend to
displace federal common-law doctrine that accords preclusionary
effect to state administrative findings? See Astoria Fed. Sav. &
Loan Assoc. v. Solimino, 501 U.S. 104, 108 (1991)("[T]he question
is not whether administrative estoppel is wise but whether it is
intended by the legislature."); University of Tenn. v. Elliot, 478
U.S. 788, 794-96 (1986); Kremer, 456 U.S. at 470 n.7 (dictum). It
is now settled, however, that State agency findings that are not
reviewed by a state court are not entitled to any preclusive effect
in a subsequent action under Title VII, see Elliot, 478 U.S. at
795-96, or the Age Discrimination in Employment Act of 1967
("ADEA"), see Astoria, 501 U.S. at 111-12. As the Supreme Court
has observed, Congress could not have intended to accord preclusive
effect to unreviewed administrative findings in a subsequent Title
VII action because under the federal remedial scheme, even the EEOC
is required to give only "substantial weight" to state proceedings. 
See Kremer, 458 U.S. at 470 (quoting 42 U.S.C. 2000e-5(b)). 
Though this review ensures that state agency proceedings are not
ignored, this standard plainly leaves room for the EEOC to depart
from state administrative findings--which would be "pointless if
the federal courts were bound by such state agency decisions," id.at 470 n.7; see Elliot, 478 U.S. at 795 (similar); cf. Astoria, 501
at 110-12 (finding that the filing provisions of the ADEA "assume
the possibility of federal consideration after state agencies have
finished theirs."). 
 In Kremer, the plaintiff had filed a discrimination
claim with the EEOC, which referred his discrimination charge to
the New York State Division of Human Rights ("NYHRD"), the state
agency charged with enforcing state discrimination law. 456 U.S.
at 464. The NYHRD found that there was no probable cause to
believe that the plaintiff's employer had engaged in the
discriminatory practice of which the plaintiff complained; the
NYHRD Appeals Board affirmed this finding. See id. The plaintiff
then filed a petition with the Appellate Division of the New York
Supreme Court, which upheld the adverse administrative decision. 
See id. This judicial determination, the parties agreed, barred
the plaintiff from bringing any action "'based upon the same
grievance' in the New York courts." Id. at 466-67 (citing N.Y.
Exec. Law 300 (McKinney 1972)). The Appellate Division's
affirmance of the agency determination brought section 1738 to bear
when the plaintiff brought his claim in federal court. See id. at
466. Because under New York law the plaintiff was barred by the
state court judgment from pursuing his claim in state court, so too
was he barred in federal court. 
 In this case, Thomas appealed the State Board's decision
to the NHSC, and the NHSC entered judgment affirming that decision.
Under Kremer, we must determine whether the NHSC's summary
affirmance of the State Board's decision bars Thomas from pursuing
her discrimination claim under New Hampshire law, and hence, by
operation of section 1738, in federal court. See, e.g., Baez-Cruzv. Municipality of Comerio, 140 F.3d 24 (1st Cir. 1998). At the
outset, we note that the controlling facts in this case are
unusual. The School Board made two "conclusions" that are
pertinent to our discussion: (1) that Thomas's classroom
performance suffered from significant problems and (2) that
Thomas's health (i.e., her voice) "had no direct bearing on her
nonrenewal." The State Board ruled that the first finding was not
"arbitrary and capricious," and thus concluded that there was
sufficient cause to uphold the termination, but vacated the second
finding, and referred the question of disability-based
discrimination to the Commission. The NHSC summarily affirmed the
State Board's bifurcated decision. The question presented is thus
whether the State Board's judicially reviewed decision that
sufficient cause existed to warrant Mrs. Thomas's nonrenewal,
viewed in conjunction with the State Board's deferral of whether
she was subject to discriminatory treatment, precludes the
plaintiff from litigating the actual reason for her dismissal. 
 Our reading of New Hampshire law persuades us that,
unlike Kremer (in which there was no dispute that New York law
barred any subsequent action based upon the same grievance), the
NHSC's affirmance of the State Board's decision here would not
preclude Thomas from litigating the reason for her nonrenewal
before the Commission and then in state court. Our analysis is
guided by Petition of Kenneth Dunlap, 134 N.H. 533 (1992), in which
the NHSC ruled on the preclusive effects of teacher tenure
proceedings brought under chapter 189:14-a. Dunlap, a high school
teacher, was informed by his Superintendent that his contract would
not be renewed for the following year. As Thomas did here, Dunlap
contested the nonrenewal before the local school board under
chapter 189:14-a, which, after a full hearing, stated as its reason
for nonrenewal the "deleterious effect of [Dunlap's] numerous
absences" that were due to his chronic asthma. Id. at 536. Dunlap
then requested a hearing before the review board of the State Board
of Education, arguing that the local school board had discriminated
against him in violation of handicap and equal protection laws. 
See id. at 537. Dunlap's primary response to School Board's
decision was that his asthma had abated since he had obtained
proper treatment and, therefore, the objectionable absences would
not occur in the future. The State Board upheld the local board's
decision, finding that Dunlap's "record of excessive absences was
sufficient for the [school board] to conclude he was not able to
perform his responsibilities." 
 Dunlap then appealed to the NHSC, claiming that "the
State Board acted illegally in upholding a discriminatory local
board decision." Id. at 538. The NHSC agreed, reversed the State
Board's decision, and ordered plaintiff reinstated, holding that
the school board's stated reason for its decision violated New
Hampshire disability discrimination law because it impermissibly
relied only on evidence of Dunlap's past impairment, without
considering the likelihood of his future impairment. See id. at
542-44 (citing N.H. Rev. Stat. Ann. ch.354-A:8). 
 After reaching the merits, the NHSC addressed a question
similar to that the plaintiff faces here: whether a plaintiff's
invocation of the "review procedures of [chapter] 189:14-a and 14-b
[forecloses] the petitioner from prosecuting a complaint before the
[New Hampshire] commission for human rights." Id. at 545-46. The
court held that it did not. The court's analysis primarily dealt
with preclusive effect of N.H. Rev. Stat. Ann. ch.354-A:13 (Supp.
1990) (current version at N.H. Rev. Stat. Ann. ch.354-A:25), which
sets forth rules governing the exclusivity of proceedings before
the Commission:
 As to the acts declared unlawful by [state
 discrimination law], the procedure herein
 provided shall, while pending, be exclusive
 and the final determination therein shall
 exclude any other action, civil or criminal,
 based on the same grievance of the individual
 concerned. If such individual institutes any
 action based on such grievance without
 resorting to the procedure provided in this
 chapter, he may not subsequently resort to the
 procedure herein. 

Id. (quoting N.H. Rev. Stat. Ann. ch.354-A:13) (emphasis added). 
The court held that chapter 354-A:13 did not preclude Dunlap from
prosecuting a discrimination complaint before the Commission.
Chapter 189 tenure hearings, the court reasoned, simply did not
constitute a "civil" action, see id. 546-47, but rather served a
more limited purpose. 
 Chapter 189 nonrenewal hearings . . . are
 optional internal administrative proceedings
 which are available to teachers whose
 contracts are not being renewed and are aimed
 at developing a final, reasoned decision on
 the issue . . . . At the time of contesting a
 nonrenewal decision, the teacher has not yet
 been dismissed but rather, has been told that
 he or she will not be continuing in that
 employment during the next school year . . . . 
 In contrast to the panoply of remedies
 available upon application to a court or to
 the human rights commission, the school board
 and the State Board are limited to approving
 or disapproving the decision not to renew. 

Id. (citations omitted). As a result, Dunlap's use of the
procedures available to him under chapter 189 did not "foreclose
recourse to the commission and its expertise in reviewing
complaints of unlawful discrimination." Id. at 547. The NHSC also
summarily rejected the argument that res judicata barred Dunlap
from proceeding, noting opaquely that its "decision holds merely
that the State Board's conclusion was incorrect as a matter of law
and does not touch upon the issue of damages, if any for
discriminatory nonrenewal." Id. The court explicitly chose not to
address the possibility of collateral estoppel. Id. 
 Here, the School Board in its brief concedes that, under
Dunlap, Thomas is not statutorily precluded from pursuing her claim
before the Commission, but nonetheless argues that collateral
estoppel and res judicata bar Thomas from seeking another judicial(as opposed to administrative) forum for her complaint. We
consider these arguments in turn. 
 Defendant asserts that due to the NHSC's and State
Board's affirmances of the school board's nonrenewal decision, the
plaintiff is collaterally estopped under New Hampshire law from
relitigating the reason for her termination. Defendant reasons
that the State Board and NHSC both determined that Thomas's
nonrenewal was lawful and thus collateral estoppel bars Thomas from
attempting to prove that the nonrenewal was, in fact, unlawful. We
disagree. 
 First, if we held that the State Board's conclusion that
there existed "sufficient cause" for a nonrenewal decision
conclusively established in a subsequent proceeding whether that
nonrenewal decision was motivated by discriminatory animus, we
would reduce Dunlap to a nullity. The Dunlap court reasoned that
a teacher can contest his or her termination through chapter 189
tenure proceedings, yet still bring a complaint before the
Commission, because the chapter 189 proceeding serves the limited
purpose of building a reasoned decision for the nonrenewal of a
teacher. The ability of a plaintiff to file a complaint with the
Commission (the right that defendant concedes Dunlap grants the
plaintiff) would be meaningless if any adverse determination from
the State Board precluded the plaintiff from litigating the reason
for her dismissal before the Commission. Cf. N.H. Rev. Stat. Ann.
ch.354-A:25 (providing that the Commission is the exclusive forum
for discrimination claims and that "the final determination therein
shall exclude any other action"). 
 Second, Dunlap aside, our reading of New Hampshire
collateral estoppel law is contrary to the defendant's position. 
In New Hampshire, the party seeking to assert collateral estoppel
has the burden of showing that the issue claimed to be the subject
of estoppel is identical to the issue determined previously, seeMorin v. J.H. Valliere Co., 113 N.H. 431, 433 (1973), and that the
disputed issue has been finally resolved on the merits, see Putnam
Lumber Co., Inc. v. Eddie Nash & Sons, Inc., 141 N.H. 670, 672
(1997). 
 Here, the issue Thomas seeks to litigate in her ADA
action is not identical to the issue that was determined in the
state proceedings. The district court premised its opinion on the
view that the School Board's stated reason established that "the
superintendent would have fired Thomas regardless of whether or not
he took her disability into account," and thus precluded Thomas
from showing that her disability was the "but for" cause of her
termination. Assuming for the sake of argument that collateral
estoppel applies to the State Board's decision, the district court
simply read the issue decided in that proceeding too broadly. The
State Board determined only that there was "sufficient evidence" in
support of the School Board's proffered reason for the nonrenewal
decision (that "Mrs. Thomas' classroom performance suffered from
significant problems"), which is essentially a determination that
there was "cause" for Thomas's nonrenewal. This determination is
not identical to the inquiry under the ADA: whether the defendant's
decision was in fact motivated by discrimination on the basis of
Thomas's voice disability. See Tolfree v. Kansas City, Missouri,
980 F.2d 1171, 1174 (8th Cir. 1992) (holding that a city personnel
board determination that a termination for bad performance was
"justified" did not preclude plaintiff from pursuing a Title VII
"mixed-motive" claim under Price Waterhouse); cf. Petition of
Gilpatric, 138 N.H. 360, 363 (1994) (holding that a superior court
finding that an employee was "sufficiently disabled" to receive
total disability benefits was not identical to an administrative
determination whether the petitioner was entitled to "a permanent
impairment award"). The claim asserted in the plaintiff's
complaint is not that she was terminated without "sufficient cause"
but that the Board's nonrenewal decision was the result of
discriminatory animus against her perceived disability. Although
the State Board's determination may establish that sufficient
grounds existed to terminate Thomas based on her classroom
performance, it does not necessarily follow that poor classroom
performance was the reason why the Board and/or Bramblett
terminated her employment. Rather, the lawfulness of the School
Board's decision not to renominate Thomas turns on the Board's
actual motivation, as opposed to whether it could have terminated
her, at the time of the nonrenewal. See Bradley v. Pittsburgh Bd.
of Educ., 913 F.2d 1064, 1075 (3d Cir. 1990) (holding that a state
finding "that defendants could properly terminate an employee" does
not establish that "the employer would have terminated the
employee" in the absence of protected First Amendment
activity)(emphasis in original). 
 Moreover, the finding of "sufficient cause" must be
viewed in conjunction with the fact that the State Board explicitly
chose not to decide whether the School Board and/or Bramblett
impermissibly discriminated against Thomas based upon her voice
disability. Understandably, the defendant attempts to characterize
the NHSC's decision broadly, describing it as affirming "the
decision of the State Board that the decision to nonrenew was
lawful." But this description does not accurately reflect the
contours of the State Board's decision. The hearing officer
explained that his review of the School Board's decision was
limited "to the determination of whether Mrs. Thomas was accorded
procedural due process by the local board, and whether that board's
findings are clearly erroneous in view of the whole record,
arbitrary, capricious or the result of an abuse of discretion." 
Under this highly deferential standard, the State Board vacated the
School Board's factual finding regarding the impact of her voice
problems on her nonrenewal because it was not supported by
substantial evidence, and referred to the Commission the question
of whether "the extent of the district's reliance on [her voice
disability] in reaching the nonrenewal decision here was
permissible." 
 Considering that Thomas's petition for a writ of
certiorari alerted the NHSC that she had a claim pending before the
Commission, it seems to us that by summarily affirming the State
Board's decision, the NHSC intended no more than to hold that the
State Board appropriately declined to decide whether the School
Board had discriminated against Thomas, and correctly found that
there was evidence in support of the school board's stated reason
for its action (poor classroom performance). We see no indication
that the State Board's administrative decision or the NHSC's
affirmance was meant to be a final judgment on the merits of
Thomas's discrimination claim and every indication that the State
Board, and by implication from its affirmance, the NHSC, believed
that the Commission was the proper forum to resolve that claim. To
accord preclusive effect here to the State Board's decision by
holding that its finding of "sufficient cause" establishes the "but
for" cause of her termination would be to ignore the same
tribunal's explicit decision to leave that "fact-sensitive"
question to the agency "best suited" to make that determination. 
See Mitchell v. Humana Hospital-Shoals, 942 F.2d 1581, 1583 (11th
Cir. 1991) (holding that, when it is impossible to divine from the
state court judgment what was actually decided, collateral estoppel
should not apply). As a result, because the State Board did not
actually decide whether plaintiff's discharge was discriminatory,
plaintiff would not be barred from further litigating that issue
under state law. See Penrich Inc., v. Sullivan, 140 N.H. 583, 590
(1995). 
 For much the same reason, we find the school board's res
judicata argument untenable. When a court, or as here, an
administrative agency, reserves a question for further
adjudication, the ensuing judgment does not generally bar
subsequent determination of that question. See Restatement
(Second) of Judgments, 26(1)(b) (1982) (stating that no merger
occurs to extinguish a claim when "[t]he court in the first action
has expressly reserved the plaintiff's right to maintain the second
action"); 18 Charles A. Wright et al., Federal Practice and
Procedure: Jurisdiction and Related Matters, 4413 (Supp. 1998)
("A judgment that expressly leaves open the opportunity to bring a
second action on specified parts of the claim should be effective
to forestall preclusion.") (citing cases). We see no other
interpretation of the State Board's decision but as an express
reservation of Thomas's discrimination claim for further
adjudication. As the NHSC did not disturb the State Board's
reservation when given the opportunity to do so, res judicata does
not apply. 
 Interpreting the NHSC's summary affirmance and the State
Board's decision in this manner accords with Dunlap's view that
Chapter 189 proceedings are for the limited purpose of developing
a record as to whether there was cause for a teacher's nonrenewal
(although the State Board and NHSC have the power to order
reinstatement when faced with unjust terminations); the Commission
is the proper forum for litigating the issue of discriminatory
motivation. We note as well that, once the State Board referred
the discrimination question to the Commission, any judicially
unreviewed finding by the Commission as to the merits of her claim
would not have been entitled to preclusive effect in federal court. 
See Elliot, 478 U.S. at 795; Astoria, 501 U.S. at 111-13. 
Unsuccessful complainants before the Commission may obtain review
of Commission orders in Superior Court, see N.H. Rev. Stat. Ann.
ch.354-A:22, I, II, and federal court, see id. 354-A:22, V
(vacating any Commission order "[i]f the complainant brings an
action in federal court arising out of the same claims of
discrimination which formed the basis of an order or decision of
the commission."). Because the NHSC's summary affirmance would not
have barred Thomas from pursuing her claim before the Commission
and then in New Hampshire state court, section 1738 does not
preclude her from proceeding in federal court.
 Finally, the defendant contends in a summary fashion
that, under the collective bargaining agreement between the
District and the Contoocook Valley Education Association, Thomas
was required to appeal her nonrenewal as specified in the grievance
procedure set forth therein, which includes submitting grievances
to arbitration. This argument is without merit. The agreement
plainly states, "The [School] Board does not agree to binding
arbitration on the following provisions. . . . Any matter for
which a specific method of review is prescribed and expressly set
forth by law or regulation of the State Commissioner of Education." 
Chapter 189 and Chapter 354 provide a method for reviewing claims
for unjust terminations and discrimination. As a result, the
plaintiff's ADA claim was not subject to mandatory arbitration and
her failure to avail herself of those procedures does not result in
a waiver of her right to bring this action. 
 For the foregoing reasons, the judgment of the district
court is vacated and the case is remanded for further proceedings
consistent with this opinion. 
 Costs to appellant.