STATE OF MAINE
ANDROSCOGGIN, ss.

RECEIVED & FILED

DEC 1 3 2005

ANDROSCOGGIN
SUPERIOR COURT

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-04-198

ᚻᚪᚳᛖ - ᚻᚢᛞ - ᛁᚾᛁ ᛞᛚᚳ

DANIEL LEPAGE,
      Plaintiff

v.

BATH IRON WORKS CORP.,
and
GENERAL DYNAMICS CORP.,
      Defendants

**ORDER ON DEFENDANT'S
MOTION FOR
SUMMARY JUDGMENT**

## PROCEDURAL HISTORY AND BACKGROUND

On September 10, 2004, Daniel LePage filed a three-count complaint against Bath Iron Works Corp. (BIW) and General Dynamics Corp. (GD) in the Androscoggin County Superior Court. In his complaint, Mr. LePage claimed that, during his employment as a security guard for BIW, he had been subjected to unlawful employment discrimination, and intentional infliction of emotional distress by the defendants, and that the defendants had violated the Whistleblower's Protection Act (WPA), 26 M.R.S.A. § 831. GD filed its answer on October 4, 2004, denying any violations and asserting nineteen affirmative defenses. BIW filed its answer on October 7, 2004, also denying all violations and asserting nineteen affirmative defenses.

The court issued a scheduling order on October 8, 2004, establishing various deadlines, and stating that the case was not subject to the requirements of M.R. Civ. P. 16B. This statement was based upon the court's mistaken understanding that Mr. LePage's complaint about BIW and GD had been subjected to review by the Maine Human Rights Commission (MHRC). Counsel for BIW appropriately brought that error to the court's attention by filing a motion to compel alternative dispute resolution on October 19, 2004. Without objection, the court granted that motion on October 27,

2004. Thereafter, the parties conducted discovery for several months, attended an unsuccessful ADR session on February 9, 2005, and concluded discovery in June 2005.

On June 23, 2005, the defendants filed a motion for summary judgment, based upon their assertions that Mr. LePage's claims against them were not timely, that he had failed to allege a cognizable claim of disability, that he had failed to establish a *prima facie* case for violation of the WPA, that his claim for intentional infliction of emotional distress was barred by the Workers' Compensation Act, and that he had failed to establish the elements of any of his claims against GD. With that motion, the defendants filed a Statement of Undisputed Material Facts (DSMF) containing forty-seven (47) paragraphs.

On July 19, 2005, Mr. LePage filed his response in opposition to the motion. With that document, he filed his responses to the DSMF, but did not file any additional statements of material fact as permitted by M.R. Civ. P. 56(h)(2). In many of his responses to the DSMF, however, Mr. LePage used either the "qualify" or "deny" response to add information that was not directly addressed by the asserted fact, and did not change the factual basis for the asserted fact. If a responding party believes that the court should consider facts not presented in the moving party's statement of material facts, the moving party should recite those facts in its additional statements of material fact, rather than in the "qualifying" response. A denial or qualifying response is not an opportunity to add facts to the record. However, because counsel for defendants responded to these added statements, the court must identify them in some fashion. These assertions will be referred to as the plaintiff's additional statements of material fact (PASMF).

With his response to the motion for summary judgment, Mr. LePage filed an affidavit from Fred Moody, a former security officer at BIW and, without additional affidavits, attached photocopies of five documents.

On July 26, 2005, the defendants filed a motion to strike Moody's affidavit and four of the five documents Mr. LePage attached to his response. The defendants argued that Moody's affidavit failed to comply with M.R. Civ. P. 56(e), and that the documents were hearsay, not part of the record, and not supported by affidavit. On that same date, defendants replied to the plaintiff's opposition to their pending motion. As noted above, in that reply, defendants responded to Mr. LePage's "qualify" or "deny" responses as though they had been asserted as additional statements of material fact. Defendants' responses will be referred to as defendants' responsive statements of material fact (DRSMF).

On August 2, 2005, Mr. LePage filed his objection to the motion to strike. He argued that the documents he submitted, without affidavit, "are of a quality that could be admissible at trial." In addition, he argued that Moody's affidavit did comply with the requirements of M.R. Civ. P. 56 (e). Defendants replied to that opposition on August 9, 2005. The findings and conclusions below are based upon the court's review of the parties' submissions, and reflect a reading of the record that gives the plaintiff the benefit of all favorable inferences.

## DISCUSSION

Before discussing the merits of the pending motion for summary judgment, the motion to strike must be disposed of. As noted above, with his opposition to the defendant's motion for summary judgment, plaintiff filed an affidavit and copies of five documents. After review of the affidavit and the documents, the court grants the defendants' motion to strike as it refers to proposed exhibits 1, 2, 4, and 5, and grants, in

3

part, the motion as it refers to the Moody affidavit. Although the *jurat* included on the Moody affidavit is not precisely tailored to the requirements of the rule, some of the statements made are clearly based entirely upon Mr. Moody's personal knowledge. Specifically, paragraphs 1, 2, 3, 4, and 7 are based upon his personal knowledge and would be admissible at trial. The documents, on the other hand, are not self-authenticating, and have not been either identified by any competent witness or supported by affidavit. They are not admissible evidence and, therefore, cannot be used to support or deny an asserted fact.

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact . . . and that [a] party is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). In determining whether this burden has been met, the court must view the record in the light most favorable to the nonmoving party, and must accept as true the uncontroverted facts properly appearing in the record. *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 5, 711 A.2d 842, 844.

The record in this case permits the court to find the following: Since 1982, Daniel LePage has been employed as a security guard at BIW. Plaintiff's complaint, ¶¶ 4, 9. After September 11, 2001, the United States Navy required BIW to arm those security guards who perform some discrete functions at the shipyard. DSMF 1. For safety reasons, BIW implemented a process patterned after established United States Department of Transportation procedures to determine which guards should be permitted to carry firearms. DSMF 2, as qualified. In order to qualify to carry a firearm, each guard had to pass a physical examination, a psychological examination, and a qualification on the shooting range. DSMF 3.[1] BIW engaged Dr. Joseph Wojcik to

---

[1] Plaintiff's denial is not responsive to the fact asserted, and is not supported by the record references provided.

4

conduct the psychological component of the qualification process. DSMF 4.[2] BIW's Chief of Occupational Medicine, Maria Mazzora, M.D., was given the responsibility for making the final decision about which guards would be qualified to carry firearms. DSMF 6, as qualified by PASMF 6.

On March 22, 2002, Dr. Wojcik evaluated Mr. LePage pursuant to BIW's program. DSMF 8.[3] He did not diagnose Mr. LePage with a psychological disorder. DSMF 10.[4] Dr. Wojcik stated, however, that Mr. LePage had the following personality traits: (1) a tendency to be overly assertive with others; (2) some difficulty getting along with others; (3) a lack of judgment skills regarding the appropriate level of response at time of conflict; (4) difficulty accepting criticism; and, (5) difficulty communicating clearly at times of stress. DSMF 11.[5] Based upon those findings, Dr. Wojcik concluded that Mr. LePage did not meet the criteria to become an armed security guard at BIW. DSMF 12.[6]

After receiving Dr. Wojcik's report, Dr. Mazorra would not qualify Mr. LePage to carry a firearm while working at BIW. DSMF 13.[7] She informed Mr. LePage of that decision in a letter dated April 30, 2002.[8] On May 8, 2002, after receiving that letter, Mr. LePage met with Dr. Mazorra. DSMF 15.[9] At that meeting, Dr. Mazorra told Mr. LePage that she was concerned about how he might react in a stressful situation.

---

[2] Plaintiff's denial is not responsive to the fact asserted.

[3] Plaintiff's qualification is not responsive to the fact asserted.

[4] Plaintiff's qualification is not responsive to the fact asserted.

[5] Plaintiff's qualification is not responsive to the fact asserted.

[6] Plaintiff's denial is not responsive to the fact asserted.

[7] Plaintiff's denial is not responsive to the fact asserted.

[8] Plaintiff's denial is not responsive to the fact asserted.

[9] Plaintiff's qualification is not responsive to the fact asserted.

She advised him to attend counseling to work on his capacity to deal with stress and to work on the issues that were preventing him from qualifying to carry a firearm. DSMF 16, 17.[10]

Sometime after that meeting, Mr. LePage saw Susan Chandler, Psy.D., for an independent evaluation. Plaintiff's complaint, ¶22. Dr. Chandler wrote that she saw Mr. LePage "for an evaluation of his personality structure and level of anger repression since these factors appeared to be weighted strongly in the weapons fitness decision." DSMF 20.[11] In Dr. Mazorra's opinion, Dr. Chandler neither addressed the issues she identified nor refuted her conclusion that Mr. LePage was not suited for carrying a firearm at work. DSMF 21.[12]

On February 23, 2003, at his request, Mr. LePage went through a second screening with Dr. Wojcik. DSMF 22.[13] Based upon the testing that accompanied that screening, Dr. Wojcik believed that Mr. LePage's psychological traits could interfere with the performance of essential job functions, and suggested that BIW explore other information before making a final decision. DSMF 23. After receiving the second evaluation, Dr. Mazorra concluded that Mr. LePage was still not qualified to carry a firearm while working at BIW and, on February 27, 2003, she wrote Mr. LePage a letter explaining that her opinion had not changed. DSMF 25, as qualified by plaintiff's denial.

---

[10] Plaintiff's denials are not responsive to the fact asserted, and is not supported by the record references provided. There is no evidence that Dr. Mazorra told Mr. LePage that change was unlikely in such a short period.

[11] Plaintiff's denial is not responsive to the fact asserted, and is not supported by the record references provided.

[12] Plaintiff's denial is not responsive to the fact asserted, and is not supported by the record references provided.

[13] Plaintiff's qualification is not responsive to the fact asserted, and is not supported by the record references provided.

On May 6, 2003, an attorney retained by Mr. LePage sent a letter to BIW questioning its decision not to qualify Mr. LePage to carry a firearm at work. DSMF 26.[14] That letter did not allege that Mr. LePage was being discriminated against because of a disability. It stated that BIW was "[treating] Mr. LePage differently than his peers based on unsubstantiated and baseless allegations." DSMF 27, as qualified by plaintiff's denial. After receiving that letter, Kevin Gildart, BIW's Vice President of Human Resources, called Mr. LePage into his office for a meeting with himself and Russell Swift. DSMF 28.[15] Mr. LePage has testified that the meeting with Mr. Gildart is the basis for his complaints that the defendants violated the WPA. DSMF 29.[16]

Mr. LePage continues to work at BIW and performs the same functions he did before the Navy required BIW to staff some of its security positions with armed personnel. DSMF 30.[17] Because he is not authorized to carry a firearm, however, Mr. LePage can no longer perform all of the duties delegated to the security force. Specifically, he can no longer guard certain areas where an armed guard is required at all times, and is not eligible for the $2.00 per hour in additional pay that goes to those who are armed. PASMF 30.

Mr. LePage filed his complaint with the MHRC on November 20, 2003. DSMF 31. He filed his complaint with the Superior Court on September 10, 2004.

---

[14] Plaintiff's denial is not responsive to the fact asserted.

[15] Plaintiff's denial is not responsive to the fact asserted, and is not supported by the record references provided.

[16] Plaintiff's denial is not responsive to the fact asserted, and is not supported by the record references provided.

[17] Plaintiff's denial is not responsive to the fact asserted.

A.    Timeliness

In their memorandum, defendants have argued that plaintiff's disability discrimination claim is not timely because he failed to file a complaint within six months after April 30, 2002, the date Dr. Mazorra told him, by letter, that he would not be qualified to carry a weapon. They have asserted that, pursuant to 5 M.R.S.A. § 4611, Mr. LePage's complaint must be dismissed. In addition, that have argued that Mr. LePage failed to meet the statutory deadline established in 5 M.R.S.A. § 4613(2)(C) for filing the complaint with this court.

The defendants have argued that the events that occurred after April 30, 2002, *i.e.*, Mr. LePage's repeated attempts to have BIW qualify him, do not postpone or toll the filing deadlines, and do not renew or create a new cause of action. In support of this position, the defendants have cited, among other cases, *Sharp v. United Airlines, Inc.*, 236 F.3d 368 (7th Cir. 2001). In *Sharp*, the Court of Appeals for the 7th Circuit addressed an employee's argument that the filing deadline was tolled by her employer's actions by stating:

> Finally, Ms. Sharp has not come forward with evidence of a "continuing violation" that might extend the statute of limitations. Before the district court, Ms. Sharp argued that United's subsequent refusals to reconsider its decision of August 1996 (not to renew the original offer), culminating in the less-generous 1998 offer, constituted a continuing course of pregnancy discrimination. However, "an employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." *Lever*, 979 F.2d at 556. Consequently, United's subsequent refusal to reconsider the August 1996 decision does not constitute a separate act of discrimination and cannot bring Ms. Sharp's claims within the 300-day statute of limitations.

*Sharp*, at 373. The plaintiff responded to this argument by citing *Provencher v. CVS Pharmacy*, 145 F.3d 5 (1st Cir. 1998). In that decision, the court explained:

> The continuing violation doctrine creates an equitable exception to the 300-day limitation when the unlawful behavior is deemed ongoing. *See, e.g., Lawton v. State Mut. Life Assurance Co. of Am.*, 101 F.3d 218, 221 (1st

8

Cir. 1996); *Sabree v. United Bhd. of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 400-02 (1st Cir. 1990); *Jensen v. Frank*, 912 F.2d 517, 522 (1st Cir. 1990). A continuing violation allows a plaintiff not only to allege otherwise time-barred acts, but more concretely, to receive damages, such as back pay, based on and reaching back to those acts. *See DeNovellis v. Shalala*, 124 F.3d 298, 307-08 (1st Cir. 1997) (citations omitted).

Continuing violations may be serial or systemic. *See Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 869 (1st Cir. 1997). Provencher argues that his claim could fall in either category. We think not. "A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint." *Sabree*, 921 F.2d at 400 n.7 (citing *Jensen*, 912 F.2d at 523). This type of claim requires no identifiable act of discrimination in the limitations period, *Muniz-Cabrero v. Ruiz*, 23 F.3d 607, 610 (1st Cir. 1994), and refers to general practices or policies, such as hiring, promotion, training and compensation. *See, e.g., Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 183 (1st Cir. 1989) (alleging a discriminatory promotional system); *Rich v. Martin Marietta*, 522 F.2d 333, 348 (10th Cir. 1975) (entire promotional system challenged as resulting in plaintiffs' staying in lower echelons interminably); *Barbara Lindemann & Paul Grossman, Employment Discrimination Law* 1355-59 (3d ed. 1996).

A serial violation occurs where a chain of similar discriminatory acts emanating from the same discriminatory animus exists and where there has been some violation within the statute of limitations period that anchors the earlier claims. *See DeNovellis*, 124 F.3d at 307. Discrimination cases may involve acts that amount to unlawful discrimination upon their repetition or escalation. *See, e.g., Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1166 (7th Cir. 1996) ("In its early stages [acts] may not be diagnosable as sex discrimination . . ., or may not cause sufficient distress . . ., or may not have gone on long enough to charge the employer with knowledge and a negligent failure to take effective remedial measures."). It therefore makes most sense to view the anchor violation requirement as demanding that the plaintiff prove a timely act forming part of and exposing a pattern of actionable sexual harassment. Merely residual effects of past discriminatory conduct, however, are not themselves acts of discrimination and therefore will not satisfy the anchor violation requirement. *See DeNovellis*, 124 F.3d at 309.

*Provencher* p. 14. Mr. LePage's accusations are based upon BIW's allegedly discriminatory behavior toward him as an individual, rather than upon any policy or practice by the company that affected other employees. Therefore, his claim will be considered as a "serial" violation. This "violation" occurred on April 30, 2002, when

9

BIW decided that Mr. LePage would not be permitted to carry a firearm. The question, therefore, is whether BIW's later action, specifically, the letter of February 27, 2003, is a "residual effect" from the earlier action, or a separate action in a pattern of discrimination.

After consideration of the record presented, and in light of the applicable case law, the court is satisfied that BIW's willingness to allow Mr. LePage an opportunity to try to resolve the issues that made him unsuitable to carry a weapon did not create a "chain of similar discriminatory acts." Its decision in April was a discrete event, not affected by its subsequent dealings with Mr. LePage. If, as Mr. LePage alleges, that decision was based upon BIW's perception of him as a disabled individual, its continuing perception of him as a disabled individual was not a separate act of discrimination. His attempts to convince BIW to amend its original decision do not extend the allegedly discriminatory act.

Mr. LePage filed his complaint with the MHRC on November 20, 2003. By failing to file his complaint within six months after the alleged act of unlawful discrimination, Mr. LePage missed the filing deadline for the MHRC. 5 M.R.S.A. § 4611. In addition, he also missed the Equal Employment Opportunity Commission's 300-day deadline. Finally, Mr. LePage also missed the filing deadline established for actions in the Superior Court. He filed this suit on September 10, 2004, more than two years after the April 30, 2002 allegedly unlawful act. 5 M.R.S.A. § 4613(2)(C).

Because the "event" giving rise to this claim occurred on April 30, 2002, and was not extended by BIW's actions thereafter, Mr. LePage's disability discrimination claim is not timely. Even if the claims had been filed in a timely manner, however, Mr. LePage would still not be successful in this suit, for the reasons outlined below.

10

B.    Disability

The Maine Human Rights Act (MHRA) states that it is the State's policy to "prevent discrimination in employment, housing or access to public accommodations on account of race, color, sex, sexual orientation, physical or mental disability, religion, ancestry or national origin." 5 M.R.S.A. § 4552. In order to demonstrate that he falls within the protections afforded by this law, Mr. LePage must establish a prima facie case that he has been discriminated against on the basis of a mental disability. Included within the definition of persons with physical or mental disabilities are individuals who actually have a physical or mental disability, individuals who have a record of a physical or mental disability, and individuals who are regarded as having a physical or mental disability. 5 M.R.S.A. § 4553(7-B). In this case, Mr. LePage has asserted that, although he does not have a mental disability, BIW has treated him as though he did have such a disability.

MHRA defines disability as follows:

"Physical or mental disability" means any disability, infirmity, malformation, disfigurement, congenital defect or mental condition caused by bodily injury, accident, disease, birth defect, environmental conditions or illness, and includes the physical or mental condition of a person that *constitutes a substantial disability as determined by a physician or, in the case of mental disability, by a psychiatrist or psychologist,* as well as any other health or sensory impairment that requires special education, vocational rehabilitation or related services.

5 M.R.S.A. § 4553(7-A) (emphasis added). The MHRC, the body charged with implementing the MHRA, has regulations stating that an impairment includes any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. MHRC Employment Reg. 3.02(C)(2)(ii). At her deposition, Dr. Mazorra testified that Mr. LePage's "mental health issues" disqualified him from carrying a weapon. PASMF 35. In a memo, she stated,

with more specificity, that Mr. LePage was rather volatile, at times prone to be overly assertive, had difficulty accepting criticism and getting along with others, and that his judgment regarding an appropriate level of response to conflict were of concern. Dr. Mazorra also stated that these were "personality profile traits that are hard to change and it is unlikely that any changes would be made in a short time period." PASMF 35, Mazorra deposition exhibit 3. Although she repeated this opinion at various times, there are no Record references demonstrating that either she or Dr. Wojcik ever diagnosed Mr. LePage with any sort of "mental impairment." In fact, Dr. Mazorra stated, "having a condition does not constitute an impairment." DOSMF 10.

In addition, even if Mr. LePage could establish that the personality profile traits cited above did fall within the definition of a mental disorder, he has failed to present any evidence to support the assertion that BIW believed that his personality profile traits substantially limited him in at least one major life activity. "Major life activities" are "functions such as caring for one's self, performing manual tasks, walking seeing, hearing, speaking, breathing, learning and working." MHRC, Employment Reg. § 3.02(C))(2)(b). There is no evidence in the record to support a finding that BIW believed Mr. LePage's personality traits prevented him from caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning or working. Carrying a firearm is not a major life activity.

In an analogous case involving the New York Police Department, a candidate was deemed to have shown poor judgment, irresponsible behavior and poor impulse control that rendered him unsuitable to be a police officer, although he was not diagnosed as having any particular psychological disease or disorder. In that case, the Court of Appeals for the Second Circuit wrote:

12

Appellant argues that due to the misperception concerning his personality traits he cannot work as a New York City police officer and therefore he is substantially limited in a major life activity--working in the Police Department. Major life activity has been defined by the regulations as, *inter alia*, "working." 45 CFR § 84.3(j)(2)(ii). However, the regulations cannot be interpreted to extend this definition to include working at the specific job of one's choice. *Tudyman*, 608 F. Supp. at 745. The position of New York City police officer demands unique qualifications that appellant has failed to meet. Being declared unsuitable for the particular position of police officer is not a substantial limitation of a major life activity. *See Forrisi v. Bowen*, 794 F.2d 931, 934-35 (4th Cir. 1986) (Several courts have decided "unanimously that an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job."). As the district court noted in *Tudyman*, "for the same reason that the failure to qualify for a single job does not constitute a limitation on a major life activity, refusal to hire someone for a single job does not in and of itself constitute perceiving the [person] as a handicapped individual." *Tudyman*, 608 F. Supp. at 746.

In *Forrisi*, the Court of Appeals for the Fourth Circuit noted that the Rehabilitation Act was intended to protect the disabled from discrimination in employment and stated that:

> it would debase this high purpose if the statutory protections available to those truly handicapped could be claimed by anyone whose disability was minor and whose relative severity of impairment was widely shared. Indeed, the very concept of an impairment implies a characteristic that is not commonplace and that poses for the particular individual a more general disadvantage in his or her search for satisfactory employment.

794 F.2d at 934 (citation omitted). Appellant's personality traits could be described as commonplace; they in no way rise to the level of an impairment.

Based upon the evidence presented, and for the reasons stated above, this court holds that the personality profile traits noted by BIW do not amount to a mental condition that substantially limits a major life activity. Therefore. Mr. LePage, as a person having those traits, or perceived as having those traits, cannot be considered a handicapped person within the meaning of the MHRA.

C.    Whistleblower Protection Act

The WPA prohibits employers from discriminating against employees who have reported some violation of law. 26 M.R.S.A. § 833. In *DiCentes v. Michaud*, 1998 ME 227, 719 A.2d 509, the Law Court explained that, to prevail upon a claim of unlawful retaliation pursuant to the WPA, the employee must show: "(1) that she engaged in activity protected by the WPA, (2) that she experienced an adverse employment action, and (3) that a causal connection existed between the protected activity and the adverse employment action." *Id.* ¶ 14, 719 A.2d at 514. Even if the court finds that Mr. LePage could establish the first element,[18] based upon the record presented by this case, Mr. LePage cannot establish a *prima facie* case for the second or third of those three elements. Mr. LePage suffered no "adverse employment action" after he sent the letter or even after he met with Mr. Gildart. All of the "adverse action" had occurred a year before either of those events. The on-going nature of BIW's refusal to allow Mr. LePage to carry a firearm does not create a nexus with the letter or the meeting with Gildart.

D.    Intentional Infliction of Emotional Distress

The exclusivity and immunity provisions of the Workers' Compensation Act bar employees from pursuing civil litigation against their employers for injuries incurred in the course of their employment. 39-A M.R.S.A. § 104. That general rule covers claims involving allegedly intentional tortious acts. *Li v. C.N. Brown*, 6645 A.2d 606 (Me. 1994); *Frank v. L.L. Bean, Inc.*, 352 F. Supp. 2d 8 (D. Me. 2005). Even if Mr. LePage were able to prevail on his claims of discrimination, the portion of his complaint alleging intentional infliction of emotional distress is barred.

---

[18] Based upon a reading that allows the plaintiff the benefit of all possible inferences, the court will assume that the letter sent to BIW's counsel by Mr. LePage's attorney contained an allegation that Mr. LePage was being treated in a discriminatory fashion because of a perceived disability.

E.    General Dynamics Corporation

BIW is a wholly owned subsidiary of GD.  That alone, however, is not a sufficient basis to hold GD liable for BIW's actions.  Neither is Mr. LePage's statement that, because GD's name appears on his paycheck, GD employs him.  Mr. LePage has failed to assert that GD played any part in the allegedly discriminatory actions taken by BIW, and has failed to allege that there would be any inequitable result from accepting BIW's separate corporate status.

## ORDER

For the reasons stated above, defendant's motion for summary judgment is granted.  Judgment is granted to the defendants on all counts of plaintiff's complaint.

The clerk is directed to incorporate this order by reference in the docket for this case.

Dated: *December 13, 2005*

Ellen A. Gorman
Superior Court Justice

15